No. 81,953

STATE OF KANSAS, *Appellee*, v. THOMAS FINLEY, *Appellant*.

(998 P.2d 95)

Opinion filed February 25, 2000.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Thomas Finley appeals his convictions of felony murder and the manufacture of methamphetamine. The charges and convictions stem from a fire at his residence occurring during the manufacture of methamphetamine and resulting in the death of LaDonna Jones. George LaMae was also charged with the same offenses, tried separately, and convicted. We have affirmed his convictions on this date. See *State v. LaMae*, No. 81,771, filed February 25, 2000.

The defendant raises six points, the following two of which require us to reverse his convictions: (1) prosecutorial misconduct resulting in the loss of testimony fundamental to his defense in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution; and (2) prosecutorial misconduct during closing argument which implied that law enforcement was the duty of the jurors and appealed to their interest as members of the community. We find substance in both contentions and reverse and remand for further proceedings. We do not address the defendant's additional arguments except to say that they provide no basis for the relief requested.

On October 1, 1997, the body of LaDonna Jones was found in the attic of defendant's residence in Kansas City, Kansas, following a fire which extensively damaged the residence. An autopsy revealed that she had died as a result of the fire, and that she had methamphetamine in her bloodstream. Evidence collected at the scene suggested that production of methamphetamine was the cause of the fire.

Agent L.D. Matthews of the Drug Enforcement Agency (DEA) testified at the defendant's trial regarding the method used in this case for manufacturing methamphetamine. The drug, which is a habit-forming stimulant proscribed by Kansas and federal law, is produced from the breakdown of ephedrine or pseudoephedrine, common ingredients in over-the-counter medications such as cold tablets. The ingredients are separated from the binder material in the tablets by adding a liquid cleaning solvent such as Naptha or methanol such as that found in Heet antifreeze. The mixture is

allowed to sit for a period of time during which the ephedrine is absorbed by the liquid and the binding material settles to the bottom. The liquid is then removed for further processing.

The liquid is evaporated, usually through the application of a heat source, leaving behind the ephedrine in a powder form. Red phosphorous and iodine crystals are then added to the ephedrine powder. The combination of these three powders will create heat but most manufacturers also apply heat to the powders to speed up the process. A small amount of water is added to make a syrupy mixture and the mixture is cooked for several hours until the powders have liquified.

The liquified mixture is removed from the heat and left to cool. It separates into a dark maroon liquid and a red phosphorus sludge. The mixture is filtered through a common coffee filter, and the liquid is saved. The liquid now contains methamphetamine, but not in a usable form. The liquid must be neutralized through the application of a base, such as that found in Red Devil lye. A solution of lye and water is added to the liquid. Coleman stove fuel is then added. The methamphetamine is drawn into the stove fuel and other contaminants sink to the bottom. The contaminants are discarded and either hydrochloric, muriatic, or sulfuric acid is added to the solution to make it crystallize. The result is methamphetamine in a powder form. The methamphetamine powder is white, but it can be other colors depending upon how much of the contaminants still remain. The powder is then dried out over slow heat.

If the powder contains too many contaminants, acetone is applied to clean it out. The powder is then ready to be used.

The process is very dangerous. Not only are the chemicals used at each stage very flammable in and of themselves, but their fumes can also be flammable. The acids used can eat through clothing and skin, and the lye can also cause burns. The red phosphorus used is a flammable solid which is commonly used in explosives, fireworks, and road flares. Iodine crystals, if exposed to air higher than 60 degrees in temperature, will emit poisonous fumes. If the solution is allowed to dry out too much during the cooking process, deadly phosgene gas is created.

In the attic of the defendant's house, the police found four gallon cans of Coleman fuel, hydrochloric acid, acetone, glass beakers, and an electric skillet, as well as a melted plastic container with remnants of a two-layer liquid. A search of the main floor of the house revealed one empty and one full can of Coleman fuel, a plastic pitcher containing coffee filters and red phosphorous residue, and a black billfold with two spoons containing white residue. In the basement, police discovered a 32 oz. bottle of muriatic acid, a 32 oz. bottle of hydrochloric acid, a 12 oz. can of Red Devil lye and two cans of Coleman fuel. A trash bag found outside the residence contained two 32 oz. bottles of VMP Naptha, four 12 oz. bottles of Heet antifreeze, three gallon cans of Coleman fuel, one 12 oz. can of Red Devil lye, 3 funnels, coffee filters, 19 empty bottles of pseudoephedrine, as well as plastic tubing and a can of duplicating fluid. Police also searched the victim's automobile parked outside the residence, and found a 32 oz. bottle of hydrochloric acid, 2 flasks, a spoon with white residue, a hand scale, a 500 ml. glass bottle of acetic acid, a bottle of methanol, and a 32 oz. bottle of glass cleaner.

The sample from the two-layer substance found in the attic was tested by the DEA laboratory. In the top liquid layer, phenacetin, a by-product of the manufacture of methamphetamine, was detected. According to DEA chemist Gerald Skorowski, phenacetin could be present at any time after the combination of iodine and phosphorous with the ephedrine powder until the final finished product. A small amount of methamphetamine was present in the solid part of the substance. Skorowski opined that due to the presence of the methamphetamine, the substance was getting ready to be "powdered out." He also testified that the relatively small amount of methamphetamine discovered could be accounted for by dilution from impurities or contamination from the fire.

The primary question at trial for both the State and the defendant was the defendant's presence at his residence when the fire started. While the State, through its evidence, placed the defendant at his residence manufacturing methamphetamine and causing the fire at his residence, the defendant testified that he left the resi-

dence well before the fire started and returned several hours later to find his residence on fire.

The State's witness Elizabeth Scarlett testified that because of problems with her roommate, she spent the night at the defendant's house the night of the fire. She testified that Lonnie Joe Pugh and Mike Quinn were also living there. On the night of the fire, she arrived at the defendant's residence after midnight. The defendant, his girlfriend Denise Sklar, and Pugh were outside. Scarlett went to bed and was awakened later to the sound of breaking glass; she heard someone yell to get out of the house. At sometime during the fire, she saw the defendant outside the house attempting to get his pants off. She then ran to a neighbor's house to call for help. She did not see either Jones or LaMae on the night in question, although she had seen them at the house earlier that day.

The State's witness Pugh testified that he had been living in the house with the defendant and had been helping to clean up the house in lieu of rent. He had previously had the electric service provided for the house in his name but had the electricity turned off a few weeks before the incident because other persons were staying in the house and using the electricity but not contributing money to pay for it. Thus, any electricity to the residence was provided by means of a cord run from a neighbor's house.

Pugh testified that he went to bed sometime after midnight on the night of the fire. At that time, Scarlett, Quinn, the defendant, Sklar, and another person, Shawn Rader, were there. Pugh woke up at approximately 4 a.m. because he heard the defendant and Sklar yelling that there was a fire. He jumped out the window in his bedroom and then went over to move his truck away from the house. According to Pugh, he then decided to drive to the defendant's mother's house nearby and call the fire department. However, LaMae suddenly jumped into the defendant's truck. LaMae told Pugh that he needed to get out of the area because he had warrants. Pugh took LaMae to LaMae's brother's house and then went to the defendant's mother's house. Pugh, with the defendant's mother, returned to the scene of the fire. The defendant was not there.

Pugh was arrested in connection with the incident. He testified that while he and the defendant were in the county jail, the defendant told him that the he and LaMae were attempting to make methamphetamine and some liquid spilled out and ignited, causing the fire.

The State's witness Rader, also known as "Slinky," testified that he was staying at the defendant's house that night because the defendant was going to help him fix his car. According to Rader, after Pugh went to bed, he saw the defendant, Sklar, LaMae, and Jones using methamphetamine. The four then went up into the attic, and the defendant told him to yell before coming up.

While Rader was downstairs, the electricity went off. Sklar and the defendant came downstairs and went out to the garage, returning with a flashlight and a headlight hooked to a car battery. Sklar then came back downstairs and went to the garage. Rader decided to go upstairs, and he yelled up but did not get an answer. Rader started to go up the stairs and as he reached the top, he saw a flaming glass pan fly across the room. He ran back down the stairs, and LaMae came running past him saying that there was a fire. Rader ran outdoors. At some point, he saw the defendant attempting to take off his pants. The defendant then told him to get into Sklar's car. Rader, Sklar, Quinn, and the defendant got in the car. The defendant's leg and hand were burned. They drove to the defendant's mother's house to get pants for the defendant and then went to a motel where the defendant sat in a tub of ice water. At checkout time, they took the defendant to the hospital to get treatment for his burns.

The State's witness Scarlett was charged by the State with a felony drug count in connection with this incident. She testified that the State told her "if I give my testimony of what I know that they would drop my charges." State witness Pugh was also charged with a drug count in connection with the case, and the State similarly made a deal to drop the charges in return for his cooperation. Pugh had a prior record including theft and had previously cooperated with federal authorities to avoid prosecution. Evidence was introduced that during the time period Pugh was incarcerated with the defendant, he would not have come into contact with the de-

fendant at the county jail because they were in different areas. Pugh also testified on cross-examination that he did not see the defendant at the house at the time of the fire but just presumed he was there.

Rader was an inmate at the Missouri Department of Corrections at the time of his testimony. He had been convicted of felony theft in an unrelated incident and placed on probation, but his probation had been revoked. While he testified on direct that the defendant was in the attic when the fire started, on cross-examination he stated that he did not see the defendant in the attic and only saw him outside the residence trying to take off his pants. According to Rader, there was a way for one to go and come to the attic without going through the room he was in. Further, like Pugh, Rader testified that he never did see the defendant making methamphetamine.

The defendant, on the other hand, testified that he spent the day before the fire working on cars. He stated that LaMae was there part of the day but left. After dark, the fuse in his neighbor's house blew, leaving him without electricity. He put his tools inside the house and went to a party with Sklar and Quinn at a friend's house. They returned home early the next morning and saw smoke coming from the house. According to the defendant, LaMae was outside the house screaming, "LaDonna's inside!" The defendant testified that he ran into the house to tell everyone to get out. He saw the stairs were on fire and he ran back out. The heat from the flames caused his work pants to melt. In trying to get them off, he burned his hand.

The defendant testified that he did not know how to make methamphetamine. He stated that the items in the trash bag were from the previous occupants of the house and the Red Devil lye and muriatic acid were for a drain problem in the house. The defendant testified that the electric skillet and other paraphernalia upstairs were not his. The defendant admitted talking to Pugh while in jail but testified that he told Pugh he was not in the house when the fire started.

The defendant also sought to have his girlfriend, Sklar, testify as to his alibi at the time of the fire. Ultimately, Sklar invoked her

Fifth Amendment right not to testify. The circumstances surround-ing her decision not to testify formed the basis for the first issue raised by the defendant.

## A. PROSECUTORIAL MISCONDUCT INVOLVING THE DEFENDANT'S WITNESS

After the completion of the State's case, the defense announced that it was prepared to present Sklar as a defense witness. Sklar had originally been charged with felony murder in this case but charges against her were dismissed at the conclusion of her prelim-inary hearing.

The prosecutor advised the court that the State "may very well re-file that charge [felony murder] against Ms. Sklar." In a com-plete and comprehensive manner, the court advised witness Sklar that the prosecutor was seriously considering filing a new criminal charge of felony murder against her, that she had a right to remain silent, and that anything she might say as a witness in the case now pending could and would be used against her in the event new charges were filed. Moreover, the court advised the witness that she should confer with counsel and that one would be appointed for her to help her make her decision.

After completing its thorough advice, the court asked counsel if there was anything else that needed to go on the record. Apparently not satisfied with the advice given, the prosecutor asked the judge to go further, stating:

> "Judge, I would ask you to advise Ms. Sklar that not only would she have to answer Mr. Finley's attorney's questions, but that I would be able to cross-examine her and she would have to answer all of my questions as well. She couldn't invoke her Fifth Amendment rights in the middle and just choose what she wants to answer, she would have to testify about every-thing, including my complete cross examination and knowing that anything she says in response to anything that I ask her could and would be used against her."

The court interrupted the prosecutor and asked the witness if she understood the prosecutor's remarks. The witness stated she understood. The court then asked the prosecutor if there was any other point she wanted to raise. The following colloquy ensued:

"[PROSECUTOR]: Right. The other thing I wanted to add, Judge, is the fact that there has been other testimony during the course of this trial that is different from that that came out at the preliminary hearing or in addition to that that came out at the preliminary hearing. There are several other witnesses now that are implicating Ms. Sklar in this. She needs to be aware I think of the total circumstances that she's putting herself into. And frankly, I think she needs to talk to an attorney other than [defense counsel for the defendant], one that has only her best interest at heart. And this is a very serious matter to charge her with felony murder. I cannot see any other attorney agreeing to let her do this, and I would seriously recommend that she talk to an independent attorney about this.

"THE COURT: You understand that, Ms. Sklar?

"MS: SKLAR: Yes.

"THE COURT: I can't advise you what to do, but I am, and I would strongly recommend that you talk to your own attorney before you would testify in this case.

"MS. SKLAR: Okay.

"THE COURT: [Defense counsel], anything that you want to say?

"[DEFENSE COUNSEL]: Just the only thing I would state for the record is that we don't know if the State intends to re-file the charges whether she testifies or not or only if she testifies. And from what the State has said about the new information, they may re-file charges anyway.

"THE COURT: Well, the circumstances as the Court understands it to be is that [the prosecutor] has indicated that she may file this charge. Period. *It is now my understanding that [the prosecutor] stated she would not file this charge, only if Ms. Sklar testifies.*

"[PROSECUTOR]: That's right."

The court reconvened the next morning. Unable to contact counsel who represented Sklar during her preliminary hearing, the court appointed counsel for Sklar. After conferring with her appointed counsel, Sklar elected to follow the recommendation of her attorney and invoked her Fifth Amendment right not to testify. At this point, counsel for the defendant stated to the court:

"[W]e would like to object on behalf of Mr. Finley that the State is using fear and intimidation to prevent us from having witnesses testify. . . . [A]nd we're just concerned that because of the threat of charges being re-filed that this jury is not going to hear the whole story as to what happened that day and we think that Mr. Finley's right to a fair trial is being denied."

The court then asked the prosecutor if there was anything she would like to place on the record, to which the prosecutor replied, "Just that it's not a threat job—Judge, this is my job."

Defense counsel was allowed to make the following proffer of what Sklar's testimony would have been had she testified:

"[W]e anticipate that her testimony would be that she was at the house that day, that she left in the afternoon, went to a number of places with Betsy Scarlett, returned to the house after being at the house for a while, she was outside helping Mr. Finley work on his car. And subsequently they hung around until the electricity went off. After the electricity went off, Mr. Finley and Ms. Sklar left the house, went over to a friend's house, and when they arrived back at the house at approximately 4:00, 4:15, the house was already on fire. At that point Mr. Finley ran in to try to wake everybody up to get people out. She stayed outside, she never even entered the house. After everyone ran out, she saw Mr. Finley's clothes were on fire, was trying to get his pants off. He took his clothes off and burned his hand and his leg because he was wearing work pants that were 50 percent polyester and 50 percent cotton and they were melting like plastic on his leg and that's how he got the burn on his hand from trying to get his pants off. Subsequent to that, they went to Mr. Finley's mother's house and got a change of clothes for him. Mr. Finley was still in pain, they went to a hotel and put him in a bathtub full of ice water. Eventually they took him to the emergency room at KU where he was treated for second degree burns at which point she was arrested. She spent about 83 days in jail before the case against her was dismissed . . . ."

The defendant contends that the State, by its actions, impermissibly intimidated Sklar into invoking her Fifth Amendment right not to testify, thus denying him testimony fundamental to his defense and violating his rights under the Sixth and Fourteenth Amendments.

The United States Supreme Court has recognized that a criminal defendant has a constitutional right to "present his own witnesses to establish a defense." *Washington v. Texas*, 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 87 S. Ct. 1920 (1967). This right is specifically found in the Sixth Amendment right to compulsory process. However, the right is so fundamental that it is incorporated into the Fourteenth Amendment's Due Process Clause. 388 U.S. at 18-19. Various types of governmental interference deprive the defendant of this right. See *Webb v. Texas*, 409 U.S. 95, 98, 34 L. Ed. 2d 330, 93 S. Ct. 351 (1972) (defense witness intimidated by remarks of trial judge); *United States v. Henricksen*, 564 F. 2d 197 (5th Cir. 1977) (defense witness intimidated by terms of plea bargain);

*United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976) (defense witness intimidated by remarks by assistant United States attorney); *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (defense witness intimidated by remarks of secret service agent involved in the case); *State v. Asher*, 18 Kan. App. 2d 881, 861 P.2d 847 (1993) (defense witness threatened by prosecutor that he would discontinue plea bargain if defendant testified).

The question in these cases is whether there is "substantial government interference with a defense witness' free and unhampered choice to testify." If so, courts hold that such interference violates the due process rights of the defendant. *Asher*, 18 Kan. App. 2d at 885; *Henricksen*, 564 F.2d at 198.

We find the actions of the prosecutor troubling. It was certainly appropriate for a prosecutor to bring to the attention of the court that prospective witnesses may unknowingly incriminate themselves and should be advised of their rights before testifying. However, once the witness had been advised by the court, the prosecution had fulfilled its duty to the court and the witness. In this case, as demonstrated by the above record, the prosecutor was not satisfied with the court's full explanation to the witness of her rights. Instead, at each opportunity the prosecutor sought to supply additional reasons to the witness why she should not testify. Finally, the prosecutor agreed with the court's somewhat ambiguous statement indicating that the prosecution intended to file a charge of felony murder if the witness testified in the defendant's trial. While the prosecutor urges this court to interpret the judge's comment and her response as a statement that she would not file charges solely on the basis that the witness testified, the record is not clear on this point.

The question we must resolve is whether, based on the entire record, the actions of the prosecutor resulted in denying the defendant due process of law or a fair trial. The exchange between the court, Sklar, the prosecutor, and defense counsel is subject to interpretation. It is at the very least apparent that the prosecutor was aggressive in the protection of witness Sklar's rights and was interested in seeing that the witness not testify. An equally fair interpretation is that the prosecutor engaged in intimidation of the

witness, including the threat of filing felony-murder charge against Sklar, if she elected to testify on behalf of the defendant.

The prosecutor was given an opportunity by the court to respond to defense counsel's claim that the prosecutor was using fear and intimidation against the witness so that the witness would not testify on behalf of the defendant. Her response was that she was only doing her job. A statement at this point by the prosecutor that she had no intent to file charges solely on the basis of the witness testifying but would rather make her decision based upon what the witness might say, would have certainly cleared any ambiguity in her earlier response to the trial court statement. Moreover, the prosecutor's earlier statement that additional evidence since Sklar's preliminary hearing established Sklar's involvement in the felony murder indicated to the witness that if she in any way displeased the prosecutor, a felony-murder charge would be filed. Clearly, from the record, the witness was made well aware that the prosecutor had sufficient evidence to refile the felony-murder charge against her.

What caused Sklar not to testify? The State argues that the prosecutor's conduct did not coerce Sklar into invoking the Fifth Amendment but did so after consultation with counsel. This assertion fails to consider the role which her conduct might have played in Sklar's decision not to testify. We note the same question arose in *Webb*, wherein the government claimed that there was no showing that the witness had been intimidated or had refused to testify because of the trial judge's conduct in warning the witness of his rights under the Fifth Amendment. The Court responded:

> "We cannot agree. . . . The fact that [the witness] was willing to come to court to testify in the petitioner's behalf, refusing to do so only after the judge's lengthy and intimidating warning, strongly suggest that the judge's comments were the cause of [the witness'] refusal to testify." 409 U. S. at 97.

Instead, the Court stated that the remarks by the judge "could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." 409 U.S. at 98.

In this case, Sklar voluntarily came to court to testify on behalf of the defendant. After thorough advice to the witness on her Fifth Amendment rights by the court, the prosecutor capitalized on every opportunity given to further convince the witness not to testify. From the record, it is impossible to determine whether, absent the prosecutor's conduct, Sklar would have asserted her Fifth Amendment right. It may well be that, having received advice of counsel, she would have asserted that right regardless of anything the prosecutor said. On the other hand, the record strongly suggests that the prosecutor's conduct in this case exerted duress sufficient to drive Sklar from the witness stand, thus infringing upon the defendant's right to present his defense.

The State argues that Sklar's testimony was not credible and the evidence of the defendant's guilt was overwhelming. The State asks this court to apply a harmless error analysis. Certainly there were solid grounds upon which the State could have attacked Sklar's credibility as the girlfriend of the defendant and a possible participant in the illegal activity resulting in the victim's death. However, it is also possible that Sklar's corroborating evidence on behalf of the defendant could have tipped the scales in favor of the defendant. It is impossible to gauge the impact Sklar's testimony may have had upon a jury. For this very reason, the majority of courts addressing this issue have held that this type of violation cannot be harmless error. *United States v. Hammond*, 598 F.2d 1008, 1013 (5th Cir. 1979); *Morrison*, 535 F.2d at 228; *Thomas*, 488 F.2d at 335-36; *Bray v. Payton*, 429 F.2d 500, 501 (4th Cir. 1970); *State v. Asher*, 18 Kan. App. 2d at 887. As stated in *Morrison*, "where the Government has prevented the defendant's witness from testifying freely before the jury, it cannot be held that the jury would not have believed the testimony or that the error is harmless." 535 F.2d at 228. But see *Peeler v. Wyrick*, 734 F.2d 378, 381-82 (8th Cir. 1984) (coercion of a witness not to testify subject to harmless error standard as any other Sixth Amendment violation). Many courts facing this question refuse to apply a harmless error analysis.

We do not hold that coercion of a witness can never be harmless error. There may be some instances where the testimony of the witness would have been immaterial to the defendant's case. How-

ever, we conclude that the error cannot be considered harmless in this case. At the close of the State's case, the evidence that the defendant was present at the time the fire started, while sufficient to convict the defendant, was by no means overwhelming. The defendant's defense was based on the premise that he left prior to any manufacture of methamphetamine and only returned after the fire started. Only one witness, Rader, put the defendant in the house immediately preceding the fire, although several testified that the defendant was there after the fire had started. Sklar's testimony, if believed, would have exonerated the defendant. As a result, the error cannot be considered harmless.

It may be that the State misunderstood what the trial court said and did not truly intend to intimidate the witness. However, it has been held that the good faith of the State is irrelevant where the actions coerce a defense witness into asserting his or her right not to testify. *Morrison*, 535 F.2d at 227. We conclude under the particular facts of this case, based on the entire record, that the defendant has satisfied his burden of establishing that the remarks of the prosecutor were of such a nature that they exerted such duress on the witness' mind as to preclude her from making a free and voluntary choice whether to testify.

## B. PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT

A prosecutor is under a duty to insure that only competent evidence is submitted to the jury and must guard against anything that could prejudice the minds of the jurors and hinder them from considering only the evidence adduced, such as appeals to sympathy or prejudice. See *State v. Ruff*, 252 Kan. 625, 636, 847 P.2d 1258 (1993). In *Ruff*, we reversed a defendant's conviction because of an improper statement of the prosecutor during closing argument to the effect that the jurors should not allow the defendant's conduct to be tolerated in their county. 252 Kan. at 631, 636. We found that the prosecutor's statement implied that if the jury found Ruff not guilty her conduct would be tolerated, and we further found that the statement was not harmless error. 252 Kan. at 636.

In *State v. Green*, 254 Kan. 669, 684-85, 867 P.2d 366 (1994), we found improper the State's following argument in closing: "What you [the jurors] decide will be what our community stands for." However, we found the statement to be harmless because the defense counsel did not move for a mistrial. 254 Kan. at 685.

In *State v. Zamora*, 247 Kan. 684, 689, 691, 803 P.2d 568 (1990), we reversed a defendant's conviction based upon the following statement of the prosecutor during closing argument: " 'He [Zamora] has raped this victim once. If he is found not guilty, he will get away with it again.' " We held that this statement transcended the limits of fair discussion of the evidence and constituted reversible error. 247 Kan. at 690-91.

The comments which form the basis for the claim of prosecutorial misconduct in the case at hand occurred in the final closing remarks of counsel, wherein the prosecutor stated:

> "You know, they say all the time that our police department enforces our laws in this country, that's not true. It's you guys. We have people in Topeka that make our laws, we have people in my office that prosecute them, but you all have the job of enforcing them. You all can find that he committed these crimes and hold him responsible for them. We cannot tolerate this kind of drug use in our community, especially when a person dies. You have to find him guilty. Thank you."

No objection to the above remarks was lodged by the defendant. Kansas does not ordinarily apply the plain error rule and reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. However, if the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *State v. McCorkendale*, 267 Kan. 263, 278, 979 P.2d 1239 (1999).

An appellate court's analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process: First, the appellate court must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, the appellate court must deter-

mine whether the remarks constituted plain error. 267 Kan. at 278-79.

In this case, the remarks of the State were clearly improper. Rather than confining the remarks to the evidence, the prosecutor informed the jurors that they were the ones who enforced the laws in the country and that "this kind of drug use in our community" could not be tolerated, especially when a person dies, and therefore the jury had to find the defendant guilty. The State's remarks are strikingly similar to those in *Ruff*, wherein we found such remarks to be reversible error. In *Ruff*, there was an objection lodged and overruled which compounded the error and resulted in our reversal. See 252 Kan. at 636.

Having found the remarks to be improper, however, this court must determine whether they constituted plain error; that is, whether they were so gross and flagrant as to prejudice the jury against the accused and deny him a fair trial. In order to find that the remarks were not so gross or flagrant, this court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. *McCorkendale*, 267 Kan. at 279.

The main question to be answered by the jury in this trial was whether the defendant was present during the specific manufacturing incident that caused the death of Jones. The last remarks addressed to the jury—"We cannot tolerate this kind of drug use in our community, especially when a person dies. You have to find him guilty."—are grounds completely unrelated to the question the jury should have considered. While it is more likely than not that the jury would have convicted the defendant absent the State's remarks, it is not at all clear beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. The evidence of the defendant's presence was not overwhelming. We conclude that the specific remarks of the prosecutor, remarks that this court has in the past clearly proscribed, constituted plain error and entitle defendant to a new trial.

Reversed and remanded for further proceedings.