No. 103,164

STATE OF KANSAS, *Appellee*, v. PEPIN F. SUTER, *Appellant*.

(290 P.3d 620)

Opinion filed December 21, 2012.

*Lydia Krebs,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney,* assistant district attorney, argued the cause, and *Nola Tedesco Foulston,* district attorney, and *Steve Six,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: We granted Pepin Suter's petition for review of the Court of Appeals' decision affirming his convictions for driving under the influence (DUI) and driving while suspended (DWS). Suter argues the panel erred in rejecting his claims that (1) the district court infringed upon his constitutional rights· to due process and to present his defense by interfering with a defense witness' decision to testify, (2) DWS is an alternative means crime, and (3) the State failed to present sufficient evidence to prove the alternative means of committing DUI and DWS.

We agree with the panel's conclusion that the district court did not substantially interfere with a defense witness' choice to testify or violate Suter's constitutional right to present his defense. We also agree with the panel that DWS is not an alternative means crime, and we affirm Suter's DWS conviction. Regarding Suter's DUI conviction, we rely on State v. Ahrens, 296 Kan. 151, 290 P.3d 629 (2012), to conclude K.S.A. 2008 Supp. 8-1567(a) does not contain alternative means of committing DUI. Instead, the phrase "operate or attempt to operate" in K.S.A. 2008 Supp. 8-1567(a) merely describes the factual circumstances that may support the "driving" element of the offense. Because Suter concedes the State presented sufficient proof he operated the vehicle while under the influence of alcohol, we affirm Suter's DUI conviction without considering the panel's conclusion that the State presented sufficient evidence of Suter's attempt to operate the vehicle while under the influence.

### FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of September 5, 2008, paramedics responding to a motorcycle accident found a single individual, Pepin Suter, at the scene. Before officers arrived, Suter told a paramedic he had wrecked his motorcycle. After Wichita Police Officer Joe Spicuglia responded to the scene of the accident, Suter told him that he lost control of his bike going into a turn. Spicuglia smelled alcohol on Suter's breath and requested and obtained a blood sample from Suter. Subsequent testing revealed that Suter's blood-alcohol concentration was .10.

The State charged Suter with DUI, alleging in Count 1 that Suter "unlawfully, operate[d] or attempt[ed] to operate a motor vehicle" while the alcohol concentration in his blood or breath was .10. In Count 2, the State alleged, in the alternative, that Suter "unlawfully, operate[d] or attempt[ed] to operate a motor vehicle" while under the influence of alcohol to the extent that he was incapable of safely operating the vehicle. The State also charged Suter with DWS, alleging Suter unlawfully operated a motor vehicle "while his privilege to drive was cancelled, suspended or revoked."

At trial, outside of the presence of the jury, the trial judge noted that Suter had subpoenaed Thomas Bailey as a witness but there had been some suggestion that Bailey might incriminate himself if he testified. The judge engaged in a lengthy colloquy with Bailey about his Fifth Amendment right against self-incrimination and ultimately appointed independent counsel to represent Bailey.

After conferring with Bailey, Bailey's counsel, Charles O'Hara, informed the judge that, against counsel's advice, Bailey had decided to testify. The judge then engaged in the following colloquy with Bailey:

"THE COURT: By fortuitous circumstances, Mr. O'Hara was scheduled to appear in my court this afternoon at 1:30, and I prevailed upon him to accept an appointment to represent you. I will say from my experience, both as a lawyer and as a judge now of 14 years and a lawyer of 32 years, the last 14 being a judge, by the circumstances that unfolded this afternoon, you have had the opportunity to have one of the best criminal defense lawyers in Sedgwick County represent you for free.

"He obviously recognizes there may be some issues, and if you take the witness stand, I don't know what your relationship is to Mr. Suter, if you are friends and you are trying to help him out, if you take the witness stand, it's not like a Miranda interview where you can then refuse to answer questions or you consult an attorney. I have provided that opportunity to you. If you choose to take the witness stand, you may in fact, through either direct or cross-examination of one or both of these lawyers, implicate yourself in the commission of a crime.

"And needless to say, Ms. Sheila is taking down everything said in this court. You will be under oath. Your testimony will be transcribed for all eternity. And in fact the District Attorney could probably take the transcript of these proceedings, if you incriminate yourself, and file criminal charges against you and you would be hard pressed to defend them, given that you have already testified in open court under oath.

"Now, this is your individual right and you can choose not to follow the advice of counsel and testify regardless of Mr. O'Hara's advice, but experienced criminal defense lawyers know more and anticipate and understand the workings and ins and outs of the law much more than you do. He has given you his advice, and I would strongly urge you to follow that advice, but it is your individual decision.

"If you choose to testify, I want to make a very clear record that this is a knowing, intelligent, free and voluntary waiver of your right against self-incrimination, should you be called to testify in this matter. Once you take the stand, it's the point of no return. Once you are up there, if you regret having waived your Fifth Amendment, it's too late.

"So I need to, one, ask you if you need to consult with Mr. O'Hara any more, or if you feel like you are fully informed of your rights against self-incrimination.

"MR. BAILEY: Yes, sir, I am.

"THE COURT: You are fully advised of your rights against self-incrimination?

"MR. BAILEY: Yes, sir.

"THE COURT: What is your decision?

"MR. BAILEY: Your Honor, I would like to testify.

"THE COURT: Okay. The Court will make a finding that Mr. Thomas Bailey, after being afforded the benefit of counsel and his experience and legal advice, has made a knowing, intelligent, free and voluntary waiver of any of his rights regarding the events of September 5, 2008, that may or may not incriminate him in the event that he takes the witness stand."

Because Bailey was not expected to be called to testify until the next day, Bailey's counsel suggested Bailey come to his office where he could advise him more about the situation if he wished, and Bailey nodded in response.

The next day at trial, Bailey appeared with counsel and indicated he would invoke his Fifth Amendment right against self-incrimination. The judge accepted Bailey's counsel's representation that Bailey would invoke his rights.

Suter testified at trial, admitting he consumed alcohol on the night of the accident. But Suter claimed Bailey drove the motorcycle that evening and that he rode on the back of the bike. Suter testified Bailey was approaching a roundabout when Suter told him they needed to stop somewhere to buy cigarettes. Suter maintained he could not remember much of what happened between the time Bailey approached the roundabout immediately before the accident and the time Suter woke up in the hospital. Suter explained he was in and out of consciousness after the accident. When asked if he knew what happened to Bailey after the accident, Suter tes-

tified that Bailey went to get help. Shay Welsh, a friend of Suter's, testified that when Bailey and Suter left her house at about 2 a.m., Bailey drove the motorcycle with Suter on the back.

Officer Spicuglia testified that at the scene of the accident, Suter never suggested that someone else drove the motorcycle. Further, Spicuglia testified he did not see anyone else on or around the motorcycle when he responded to the motorcycle accident.

The parties stipulated at trial that Suter's driving privileges were suspended on the day of the accident and that he had prior notice of the suspension.

Regarding the first count of DUI, the trial court instructed the jury:

"The defendant is charged in Count 1 with the crime of operating a vehicle while the alcohol concentration in his blood or breath is .08 or more as measured within two hours of the time of *operating or attempting to operate* the vehicle. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved. Number 1, that the defendant *drove or attempted to drive* a vehicle. Number 2, that the defendant while *driving or attempting to drive* had an alcohol concentration in his blood or breath of .08 or more as measured within two hours of the time of *operating or attempting to operate* the vehicle. And number 3, this act occurred on or about the 5th day of September, 2008, in Sedgwick County, Kansas." (Emphasis added.)

In Instruction No. 5, the trial court instructed the jury as to the elements of Count 2, the alternative count of DUI, but did not include any language related to an attempt to operate.

Regarding the DWS charge, the trial court instructed the jury:

"To establish this charge, each of the following claims must be proved. Number 1, that the defendant *drove* a vehicle upon a highway. . . . Number 2, that the defendant did so when his privilege to drive a motor vehicle was *canceled, suspended or revoked*. Number 3, that this act occurred on or about the 5th day of September, 2008, in Sedgwick County, Kansas." (Emphasis added.)

The jury convicted Suter of DWS and both DUI counts. After accepting the jury's verdict, the district court noted that Suter could be sentenced for only one count of DUI even though the jury found him guilty on the alternative counts. The journal entry of judgment indicates the court dismissed Count 2. The court sen-

tenced Suter to a 1-year jail term and ordered him to pay a total of $1,700 in fines. Suter directly appealed to the Court of Appeals.

*Court of Appeals' Decision*

The Court of Appeals affirmed Suter's convictions but vacated the fines imposed and remanded the case to the district court for reconsideration of the method of payment of the fines in light of *State v. Copes*, 290 Kan. 209, 224 P.3d 571 (2010). *State v. Suter*, No. 103,164, 2011 WL 2039739 (Kan. App. 2011) (unpublished opinion), *rev. granted* 293 Kan. 1113 (2011).

The panel rejected Suter's claim that the district court's comments to Bailey regarding Bailey's potential testimony violated Suter's constitutional right to present witnesses on his own behalf and denied him a fair trial. 2011 WL 2039739, at *10. The panel also rejected Suter's claim that DWS is an alternative means crime. 2011 WL 2039739, at *13. Regarding Suter's DUI conviction, the panel applied the rationale from *State v. Ahrens*, No. 103,662, 2011 WL 767858 (Kan. App. 2011) (unpublished opinion), *rev. granted* 292 Kan. 966 (2011), to conclude that although the DUI statute contains alternative means, the State presented sufficient evidence to support each means. *Suter*, 2011 WL 2039739, at *3-4. We granted Suter's petition for review, obtaining jurisdiction under K.S.A. 20-3018(b).

## DISCUSSION

*The district court did not violate Suter's constitutional rights by advising a potential defense witness of his right against self-incrimination.*

Suter contends the district court violated his right to present a defense and his right to due process under the Sixth and Fourteenth Amendments to the United States Constitution by convincing a potential defense witness, Thomas Bailey, not to testify.

"The right to present witnesses to establish a defense is guaranteed under the Sixth Amendment right to compulsory process. It is fundamental to a fair trial, and denial of the right is a denial of due process under the Fourteenth Amendment to the United States Constitution." *State v. Finley*, 268 Kan. 557, Syl. ¶ 1, 998

P.2d 95 (2000). Various types of governmental interference may deprive a defendant of this right. 268 Kan. at 566. When a defendant claims such a deprivation,

"the question is whether there was substantial government interference with a defense witness' free and unhampered choice to testify. The burden is upon the defendant to establish that the actions of the State or the court exerted such duress on the witness' mind as to preclude him or her from making a free and voluntary choice whether to testify." 268 Kan. 557, Syl. ¶ 2.

"When a criminal defendant claims that a district judge has interfered with his or her constitutional right to present a defense, an appellate court reviews the issue de novo." *State v. Carter*, 284 Kan. 312, Syl. ¶ 2, 160 P.3d 457 (2007).

Both parties rely upon *Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972), to support their respective arguments. There, the defendant argued that the trial judge "violated his constitutional rights by 'threatening and harassing' the sole witness for his defense, so that the witness refused to testify." 409 U.S. at 95. The witness had a prior criminal record and was serving a prison sentence at the time of trial. On his own initiative, the trial judge admonished the witness, stating:

" 'Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [*sic*] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The Court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.' " 409 U.S. at 95-96.

Based on these circumstances, the Supreme Court in *Webb* concluded the judge's comments precluded the witness from making a free and voluntary choice whether to testify. The Court reasoned:

"The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole. At least some of these threats may have been beyond the power of this judge to carry out. Yet, in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." 409 U.S. at 97-98.

Ultimately, the Supreme Court concluded that under the circumstances of the case, "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." 409 U.S. at 98.

Suter argues the trial judge's admonishment to the witness in *Webb* is analogous to the trial judge's warning to Bailey in this case. He contends that, like in *Webb*, the judge here did not simply warn Bailey of his right to refuse to testify. Instead, the trial judge pointed out that the district attorney "could probably take the transcript of these proceedings, if you incriminate yourself, and file criminal charges against you and you would be hard pressed to defend them, given that you have already testified in open court under oath." Suter argues the judge used unnecessarily strong terms in warning Bailey about the consequences of his decision to testify. Suter further argues that Bailey intended to testify on Suter's behalf until the judge repeatedly warned him against testifying, and he asserts that the trial judge's warning exerted such duress on Bailey that he was precluded from making a free and voluntary choice whether to testify.

The State argues *Webb* is distinguishable for several reasons. First, the witness here, unlike in *Webb*, did not refuse to testify based on the trial court's admonition. Rather, Bailey clearly stated he planned to testify even after the trial judge's comments. Further, the State points out that unlike Bailey, the witness in *Webb* chose to testify without advice from counsel. Finally, the State

points out that the judge's comments in *Webb* were focused on the possibility of the witness perjuring himself on the stand, while the judge here did not seem concerned with perjury. Rather, the judge indicated that Bailey might implicate himself in a crime, such as leaving the scene of an injury accident, if he testified he was driving the motorcycle when it crashed.

The panel found *Webb* distinguishable. *Suter*, 2011 WL 2039739, at *8-10. "In this case, the judge's comments, while arguably ill-advised and excessive, did not reach the level of the judge's comments in *Webb*." 2011 WL 2039739, at *8. The panel noted that the judge did not threaten the witness but rather strongly advised the witness of the consequences of giving up his Fifth Amendment rights. 2011 WL 2039739, at *9. Further, the panel noted that "although the words 'strongly urge' would have been better left unsaid, and the judge's warnings were excessive, the warnings were not a threat." 2011 WL 2039739, at *9. In light of the entire record, the panel found Suter failed to meet his burden to establish that governmental interference prevented Bailey from testifying. 2011 WL 2039739, at *10.

We agree with the panel's analysis and conclusion. Like the witness in *Webb*, Bailey appeared in court to testify on behalf of Suter. And Bailey's proposed testimony—that he, not Suter, was driving the motorcycle at the time of the accident—undoubtedly was material and favorable to the defense. See *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). But unlike in *Webb*, Bailey did not refuse to testify after the judge's warning. Instead, he reaffirmed that he planned to take the stand after speaking with independent counsel and after the judge's warning. Moreover, it was not until the following day, after further consultation with counsel, that Bailey chose to assert his Fifth Amendment right.

Under these circumstances, we conclude the judge's comments to Bailey may have been excessive but did not exert duress sufficient to drive him from the witness stand, nor did they infringe upon Suter's constitutional right to due process or to present his defense. See *Finley*, 268 Kan. at 569. Accordingly, we affirm the

panel's conclusion that Suter's constitutional rights were not violated.

*K.S.A. 2008 Supp. 8-262 does not set forth alternative means of committing DWS.*

Suter claims the panel erred in concluding that DWS is not an alternative means crime.

The statute at issue here, K.S.A. 2008 Supp. 8-262(a)(1), provides in relevant part:

"Any person who drives a motor vehicle on any highway of this state at a time when such person's privilege so to do is canceled, suspended or revoked or while such person's privilege to obtain a driver's license is suspended or revoked pursuant to K.S.A. 8-252a, and amendments thereto, shall be guilty of a class B nonperson misdemeanor on the first conviction and a class A nonperson misdemeanor on the second or subsequent conviction."

Suter argues the statute sets out three distinct means of committing the crime: (1) driving with a suspended license, (2) driving with a revoked license, and (3) driving with a canceled license. According to Suter, because DWS is an alternative means crime, his DWS conviction must be reversed because the State charged him with, and the jury was instructed on, all three means, but the State proved only that Suter's driving privileges were suspended. Suter's argument relies upon on our decisions in *State v. Timley*, 255 Kan. 286, 290, 875 P.2d 242 (1994), and *State v. Wright*, 290 Kan. 194, 206-07, 224 P.3d 1159 (2010).

In *Timley*, this court established what we have since referred to as the "alternative means rule" and its corollary "super-sufficiency requirement":

" '[W]here a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.]' " *Timley*, 255 Kan. at 289 (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]).

In *Wright*, this court reinforced that a criminal defendant possesses a statutory right under K.S.A. 22-3421 to a unanimous jury verdict and that the enforcement of the *Timley* rule and its cor-

ollary super-sufficiency requirement "is the only choice" to ensure that statutory right. *Wright*, 290 Kan. at 201, 206.

After the panel issued its decision in this case, we reshaped the alternative means landscape in *State v. Brown*, 295 Kan. 181, 284 P.3d 977 (2012). There, we reiterated *Timley's* alternative means rule and its corollary super-sufficiency requirement and declined the State's invitation to reconsider *Wright's* conclusion that enforcement of that rule is necessary to protect a criminal defendant's statutory right to jury unanimity. *Brown*, 295 Kan. at 188-89.

But in *Brown*, we refined our method of identifying alternative means within a statute. Specifically, we explained that our determination of whether a statute provides alternative means of committing a crime is governed by legislative intent, and we identified several guidelines to be used in ascertaining that intent. *Brown*, 295 Kan. at 189-200. Because legislative intent governs, our first task is to consider the language of the statute to determine whether the legislature intended to create alternative means of committing the crime at issue. 295 Kan. at 193-94. Whether alternatives within a statute define alternative means of committing the crime is a question of law over which we exercise de novo review. 295 Kan. at 193-94.

The panel rejected Suter's argument that the legislature's use of the disjunctive "or" before the last of the three terms "canceled," suspended," and "revoked" in K.S.A. 2008 Supp. 8-262 creates three separate and distinct means of violating the statute. Ultimately, the panel reasoned "there is only one alternative means of violating 8-262, that is, driving as proscribed by the statute." *Suter*, 2011 WL 2039739, at *12-13.

Although the panel's decision in this case predated *Brown*, the panel's reasoning is consistent with this court's rationale in *Brown*. As we stated there, "[i]dentifying an alternative means statute is more complicated than spotting the word 'or.'" *Brown*, 295 Kan. at 193. Instead,

"a court must determine for each statute what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea*, *actus reus*, and, in some statutes, a causation element? Or is it to merely describe a material element or a factual

circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. [Citation omitted.]" *Brown*, 295 Kan. at 194.

We agree with the panel that the legislature's use of the disjunctive "or" in the phrase "canceled, suspended or revoked" was not intended to create three means of committing the crime of DWS. Instead, utilizing *Brown's* rationale, we conclude the *actus reus* of the crime of DWS is driving without a privilege to do so. Thus, the phrase "canceled, suspended or revoked" simply describes the different factual circumstances that can prove that material element of the crime.

Accordingly, we affirm the panel's conclusion that DWS, as defined in K.S.A. 2008 Supp. 8-262, is not an alternative means crime, and we affirm the panel's decision affirming Suter's DWS conviction.

*Suter is not entitled to reversal of his DUI conviction.*

Finally, Suter claims he was deprived of his right to a unanimous jury verdict on Count 1, his DUI conviction, because the State charged him with alternative means of committing DUI by alleging that he operated or attempted to operate a vehicle while under the influence of alcohol and the jury was instructed on both means. Suter argues that because the State failed to present sufficient evidence to establish that he attempted to drive the motorcycle, his DUI conviction must be reversed.

Applying *Brown's* guidelines, we recently concluded in *State v. Ahrens*, 296 Kan. 151, 160-61, 290 P.3d 629 (2012), that the DUI statute in question, K.S.A. 2008 Supp. 8-1567(a) does not contain alternative means. See also *State v. Perkins*, 296 Kan. 162, 166-67, 290 P.3d 636 (2012) (applying *Ahrens*).

We reasoned in *Ahrens* that the legislature did not intend to create alternative means of committing DUI by placing the disjunctive "or" between the term "operate" and the phrase "attempt to operate" in K.S.A. 2008 Supp. 8-1567(a). *Ahrens*, 296 Kan. at 166-67. Instead, we determined that the term "operate" and the

phrase "attempt to operate" "merely 'describe the factual circumstances in which a material element' " of the crime of DUI—*i.e.,* driving—" 'may be proven.' " *Ahrens,* 296 Kan. at 160 (quoting *Brown,* 295 Kan. at 196-97).

Consequently, the inclusion of the phrase "operating or attempting to operate" in the charging instruction for Count 1 in this case did not require the State to prove both sets of factual circumstances that would support the driving element of the offense. See *Perkins,* 296 Kan. at 166-67 (citing *Brown,* 295 Kan. at 196-97). And, like any conviction, a DUI conviction "can be supported by direct or circumstantial evidence." *Perkins,* 296 Kan. at 167.

Based on our conclusion in *Ahrens* that K.S.A. 2008 Supp. 8-1567(a) does not contain alternative means, we reverse the panel's decision finding that the jury was charged with alternative means on Count 1. Because Suter concedes that the State's evidence, if believed by the jury, is sufficient to establish that he operated the motorcycle under the influence of alcohol, we need not consider the panel's conclusion that the State presented sufficient evidence that Suter attempted to operate the vehicle while under the influence of alcohol.

Our review of the record confirms that the evidence was more than sufficient to establish that Suter operated the vehicle while under the influence. Although at trial Suter denied driving the motorcycle before the crash, both the paramedic and the arresting officer testified that at the scene of the accident, Suter admitted he wrecked his motorcycle. Further, the arresting officer testified that Suter never suggested that anyone else drove the motorcycle, and Suter was the only person present at the accident scene. This evidence, when combined with Suter's blood-alcohol concentration of .10, is more than sufficient to support Suter's DUI conviction, and we affirm that conviction.

Judgment of the Court of Appeals on the issues subject to our review is affirmed in part and reversed in part. Judgment of the district court on those issues is affirmed.