IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,203

STATE OF KANSAS,
*Appellee*,

v.

ZACHARY BUCK-SCHRAG,
*Appellant*.

SYLLABUS BY THE COURT

1.

It is error for a prosecutor to urge jury members to convict based on a duty to protect the community.

2.

An appellate court reviews instructions as a whole to see whether they properly and fairly stated the law as applied to the facts of the case and could not have reasonably misled the jury.

3.

K.S.A. 2019 Supp. 21-6820(e)(3) does not require an appellate court to review for the first time on appeal a claim that the identical offense doctrine required the district court to sentence the defendant in accordance with a crime other than the crime of conviction.

1

4.

Under K.S.A. 22-4513(b), the sentencing court at the time of initial assessment must consider the financial resources of the defendant and the nature of the burden that payment will impose explicitly, stating on the record how those factors have been weighed in the court's decision.

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed December 18, 2020. Affirmed.

*Peter T. Maharry*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Natalie A. Chalmers,* assistant solicitor general, argued the cause, and *Derek Schmidt,* attorney general, was on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: A jury convicted Zachary Buck-Schrag of first-degree felony murder, criminal discharge of a firearm at an occupied vehicle, aggravated assault, and criminal possession of a firearm. We affirm.

FACTS

On January 13, 2018, Buck-Schrag, Carissa Williams, and Michael Raines stopped at a service station on their way to a bar in Topeka, Kansas. Williams was driving her SUV, and Buck-Schrag was her passenger. Raines was in his own car. They parked both

2

vehicles at the gas pumps, and Williams went inside to pay for gas. Travis Larsen and his friend and roommate, Bruce Reynolds, were also parked at the service station in Larsen's car. They noticed Buck-Schrag, Williams, and Raines, but were not acquainted with them. Shortly after Buck-Schrag and his friends arrived, Larsen drove out of the parking lot.

Buck-Schrag watched Larsen's car leave. When Larsen stopped at a stoplight alongside the gas station, Buck-Schrag thought he heard someone from inside the car yell something at him. He also thought he saw something long and silver that looked like a clip. After seeing this object, Buck-Schrag showed Larsen and Reynolds his own pistol. Upon seeing the weapon, Larsen pulled back into the parking lot. Raines and Buck-Schrag began walking towards the car to ask the men what they wanted, but Larsen quickly left again. By this time, Williams had finished pumping gas, so she and Buck-Schrag got into her SUV, Raines got into his car, and the three headed for the bar.

As the group drove down the street, with Raines leading and Williams and Buck-Schrag behind, they noticed Larsen's car pull in behind them. Williams changed lanes to see if Larsen was following them and Larsen also changed lanes. Buck-Schrag told Williams to turn right to try to get away from the vehicle. Williams complied and began to speed up. Larsen also turned and kept pace with Williams. Williams kept driving and made a few more turns and Larsen continued following. On her third turn, Williams' speed and the snowy conditions caused her to lose control of her SUV and she slid off of the road. Seconds later, the front driver's side of Larsen's vehicle hit the back passenger's side of Williams' SUV. Buck-Schrag immediately leaned out of his window and fired four shots at Larsen's vehicle. Buck-Schrag would eventually testify that he believed the crash was intentional and that his and Williams' lives were in danger.

3

Williams immediately drove away. Police were alerted to the gunshots and responded to the scene, where they found Larsen dead from a gunshot wound. Reynolds was not in the car; he had run home after the shooting. When police eventually searched the vehicle and Larsen and Reynolds' home, they found no firearms.

After the shooting, Williams and Buck-Schrag drove to Buck-Schrag's friend's house and exchanged Williams' SUV for Buck-Schrag's car. From there, they went to Buck-Schrag's mother's house where Buck-Schrag changed clothes and exchanged his car for his mother's truck. They returned Williams to her SUV and both went home.

The next morning, Buck-Schrag woke up, went to pick up some breakfast, and threw his gun away. Later that day he heard police were looking for him in connection to a murder, so he left town. He came back after a short time and turned himself in.

Williams also learned the police were looking for her, so she voluntarily came to the police station for questioning. Before she went in, she spoke with Buck-Schrag. He told her to lie about what had happened and tell the police she backed her SUV into something.

The State charged Buck-Schrag with felony murder and intentional second-degree murder as an alternative. He was also charged with aggravated assault, criminal discharge of a firearm at an occupied vehicle, and criminal possession of a firearm. Buck-Schrag filed a motion for immunity based on self-defense. The district court denied the motion after deciding there was probable cause to support a conclusion that Buck-Schrag had neither a subjective nor objectively reasonable belief that deadly force was necessary.

The jury found Buck-Schrag guilty of all counts. The court sentenced Buck-Schrag to life in prison with a minimum term of 586 months for the murder conviction. It also sentenced him to 32 months' imprisonment for the criminal discharge of a firearm conviction, 12 months' imprisonment for the aggravated assault conviction, and 8 months' imprisonment for the criminal possession conviction, all to run concurrent to the life sentence. Finally, it ordered Buck-Schrag to pay $7,000 in attorney fees.

Buck-Schrag took a timely appeal to this court.

DISCUSSION

Buck-Schrag argues the prosecutor erred by making comments during closing argument that persuaded the jury to convict based on its desire to protect the community rather than on the evidence.

We use a two-step process to analyze claims of prosecutorial error. First, we determine whether error occurred. The prosecutor committed error if "'the act complained of [fell] outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial.'" *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 (2020) (quoting *State v. Chandler*, 307 Kan. 657, Syl. ¶ 6, 414 P.3d 713 [2018]). If we find error, we move to a harmlessness analysis to "determine whether the error prejudiced the defendant's due process rights to a fair trial." 311 Kan. at 910 (citing *Chandler*, 307 Kan. 657, Syl. ¶ 6). The error was harmless if the State has shown "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" 311 Kan. at 910 (quoting *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 [2016]). In other words,

5

"'there is no reasonable possibility that the error contributed to the verdict.'" *Chandler*, 307 Kan. at 674 (quoting *Sherman*, 305 Kan. at 109).

We recently reiterated the law governing prosecutorial error:

"'A prosecutor has wide latitude in crafting arguments and drawing 'reasonable inferences from the evidence but may not comment on facts outside the evidence.' Any argument 'must accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law."' [Citations omitted.]" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015).

"The prosecutor is constrained from inviting the jury to rely on considerations outside the record because the jury's fundamental task is to decide a case based on a calm and dispassionate consideration of the evidence and controlling law. *State v. Holt*, 300 Kan. 985, 998, 336 P.3d 312 (2014); *State v. Hall*, 292 Kan. 841, 853, 257 P.3d 272 (2011); *State v. Ruff*, 252 Kan. 625, 633, 847 P.2d 1258 (1993); Gershman, Prosecutorial Misconduct § 11:4 (2d ed. 2019). Thus, a prosecutor's comments are improper if they encourage jurors to consider emotions, passions, or prejudices as a basis for their verdict, because emotions, passions, and prejudices are not facts. *Holt*, 300 Kan. at 998 (improper to encourage jurors to rely on emotions to convict); *Hall*, 292 Kan. at 853 (prosecutors are not allowed to inflame passions or prejudices of jurors and distract from duty to make decisions based on evidence). . . .

"This court has emphasized that claims of prosecutorial error are fact specific and outcomes will depend on the particulars of each case. *Sherman*, 305 Kan. at 110-11; see also *United States v. Hasting*, 461 U.S. 499, 508-09, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983) (observing that *Chapman* affirmatively rejected a per se rule)." *Thomas*, 311 Kan. at 910-11.

6

Buck-Schrag avers the following comments, made by the prosecutor during closing argument, were error:

> "We might be afraid of one another from time to time. People might do things that are annoying or even troublesome. But this is not Dodge City, this is not the Wild West, and this is not *Mad Max Beyond Thunderdome*. We simply cannot go around killing one another with guns just because we are afraid. Please, find the defendant guilty."

Our caselaw makes it clear it is error to urge jury members to convict based on a duty to protect the community.

In *State v. Finley I*, 268 Kan. 557, 998 P.2d 95 (2000), the prosecutor erred by making the following comments during closing argument:

> "'You know, they say all the time that our police department enforces our laws in this county, that's not true. It's you guys. We have people in Topeka that make our laws, we have people in my office that prosecute them, but you all have the job of enforcing them. You all can find that he committed these crimes and hold him responsible for them. We cannot tolerate this kind of drug use in our community, especially when a person dies. You have to find him guilty. Thank you.'" *Finley I*, 268 Kan. at 571.

These remarks amounted to reversible error because they asked jurors to look outside of the evidence. This court compared them to remarks made by a prosecutor in *State v. Ruff*, 252 Kan. 625, 847 P.2d 1258 (1993). In *Ruff*, the prosecutor erred when he said to the jury, "'Ladies and gentlemen of the jury, do not allow this conduct to be tolerated in our county. . . . Send that message, ladies and gentlemen, come back with a verdict of guilty. Thank you.'" 252 Kan. at 631, 636.

7

This court also found error in *State v. Zamora*, 247 Kan. 684, 687, 689-90, 803 P.2d 568 (1990), where the prosecutor told the jury, "'[The defendant] has raped this victim once. If he is found not guilty, he will get away with it again.'"

The prosecutor erred in *State v. Jordan*, 250 Kan. 180, 193, 825 P.2d 157 (1992), by saying, "'And if you want to live in a community where a person can kill another person . . . in the manner that this was conducted and excuse it because he had a few drinks, that's up to you.'"

And in *State v. Green*, 254 Kan. 669, 684-85, 867 P.2d 366 (1994), it was error for the prosecutor to say,

> "'Ladies and gentlemen of the jury, you are here to decide this case to determine what the verdict is and the outcome of this case. The issue is the death of Daniel Evans and the involvement of that man in that death. What you decide will be what our community stands for.'"

Although this court routinely finds error in a prosecutor's appeal to community interests, it has, at times, also rejected a defendant's claim that a prosecutor made such an error. In *State v. Adams*, 292 Kan. 60, 71, 253 P.3d 5 (2011), the defendant argued the prosecutor improperly appealed to the jury members' sense of community by stating in closing argument: "'Do not, I implore you, sanction this behavior. You agree to the defendant's theory that this was self-defense you are sanctioning his behavior.'" 292 Kan. at 71. In considering this statement, this court observed that the defendant had taken the statement out of context. The prosecutor's full remarks were:

> "'Do not, I implore you, sanction this behavior. You agree to the defendant's theory that this was self-defense, you are sanctioning his behavior and the evidence does not support

8

it. He's asking you to ignore people, ignore evidence, and most importantly, ignore the law because you do not bring a gun to a fist fight and you do not shoot someone who's only attacking physically even if that's true, and I'm not saying it is. There's some real dispute there.'" 292 Kan. at 72.

In context, the comments were not an "appeal to community interests; rather, the prosecutor was arguing that the evidence did not support Adams' theory of self-defense." 292 Kan. at 73. The comments were like those in *State v. Finley II*, where, in the defendant's second trial after remand, the prosecutor asked the jury not to let the defendant "'get away with'" his crime. 273 Kan. at 244. The *Finley II* court held the prosecutor's comments were not erroneous; they were simply an argument that "'the defendant should not escape responsibility for this crime based on his highly implausible story.'" *Adams*, 292 Kan. at 72 (quoting *Finley II*, 273 Kan. at 245).

Buck-Schrag likens the prosecutor's remarks in this case to those in *Ruff* and *Finley I*. The State avers the prosecutor's comments in this case, when considered in context, where akin to those in *Finley II*.

The State's arguments are compelling. It points out the prosecutor made his comments while in the midst of an argument that the defendant's subjective fear was not enough to justify self-defense:

"[E]ven if he did believe in his own mind that he had to use deadly force, that is, not just that he had to use some kind of force but that he had to use force that is likely to either kill these people or cause them great bodily harm that conclusion is not reasonable when you look at all of the evidence.

9

"Because again, the defense's argument in this case is entirely from his own perspective but it misstates or it overlooks some of the things that he was doing. For apparently no real good reason, he pulls out a Glock 40 and then these people start to follow them. When he's asked about this on cross-examination, he doesn't say, yea, I could understand why they might follow me, what with me having kind of threatened them with a gun and all of that sort of stuff.

"But ultimately, the thing that the defendant says was the biggest threat or the most troublesome problem in this situation is when the car hit him, right? So at that point, he's not saying I was worried that they were going to pull out a pistol and shoot me. At that point in time, it's because of the collision.

"But the defendant, by his testimony and the other evidence, the defendant didn't even wait for the dust to settle on that. He didn't wait for the cars to stop to see what happened next, to see if maybe, you know, are they going to try and ram us again or what are they going to do. No. He just reached out of the car and he started shooting and that's too much. That's excessive. . . . Not reasonable under the circumstances. You should have no reasonable doubt whatsoever that the defendant acted in self-defense because the evidence clearly shows that he did not. This is a civilized society. We might be afraid of one another from time to time. People might do things that are annoying or even troublesome. But this is not Dodge City, this is not the Wild West, and this is not *Mad Max Beyond Thunderdome*. We simply cannot go around killing one another with guns just because we are afraid. Please, find the defendant guilty."

The State describes these comments as a callback to earlier remarks, when the prosecutor said the following:

"Is it reasonable to shoot someone in the head when you don't know what's going on? When you don't know exactly what's going to happen? Is that reasonable? Does that make sense? It's a question you're going to have to ask as you deliberate in this case because there is no question who killed Travis Larsen. The man who killed Travis

10

Larsen, by his own admission, is here in this courtroom today. The real question that's posed in this case is whether or not the defendant's behavior was lawful, justified under the laws of self-defense.

"[Defense counsel] is right about a couple of things. The State has the burden of proof. The defendant does not. The State has met its burden of proof in this case and you should follow the law and that's what I'm going to talk about right now.

"Because fear is not enough. We live in a civilized society. Our fear of one another does not justify our killing one another. This is what the law is. . . . 'A defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself or someone else from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by the defendant and the existence of facts that would persuade a reasonable person to that belief.'"

In sum, the State argues, the prosecutor was merely arguing that fear, by itself, was not sufficient to use deadly force.

We conclude that, while the prosecutor surely toed the line, he did not err. The prosecutor made the comments in the midst of an argument that self-defense must have subjective and objective justification. We view the remarks as an effort to impress upon the jury the legal reality that a defendant cannot use deadly force based on subjective fear alone. Although the comments ride a fine line, they are more like those in *Adams* and *Finley II* and, consequently, were not erroneous.

11

*Sufficiency of the Evidence*

Buck-Schrag argues that he shot Larsen in self-defense and that the State failed to provide sufficient evidence to disprove that theory beyond a reasonable doubt. Consequently, he urges this court to vacate his convictions for aggravated assault, criminal discharge of a firearm at an occupied vehicle, and felony murder.

When a defendant has challenged the sufficiency of the evidence, this court "review[s] the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Rucker*, 309 Kan. 1090, 1093, 441 P.3d 1053 (2019) (quoting *State v. Lowery*, 308 Kan. 1183, 1236, 427 P.3d 865 [2018]). It does not "'reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. . . . [T]here is no distinction between direct and circumstantial evidence in terms of probative value.'" *Rucker*, 309 Kan. at 1093 (quoting *Lowery*, 308 Kan. at 1236). "'A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.'" *Rucker*, 309 Kan. at 1093 (quoting *Lowery*, 308 Kan. at 1236).

Under K.S.A. 2019 Supp. 21-5108(c), once a defendant provides competent evidence supporting a theory of self-defense, "the state has the burden of disproving the defense beyond a reasonable doubt." Presumably, the district court found that Buck-Schrag provided competent evidence of self-defense, because the court instructed the jury on that theory. And the State has not alleged that Buck-Schrag failed to satisfy this requirement. Thus, the State had a burden to disprove the self-defense theory at trial.

12

Buck-Schrag argues that the State failed to present sufficient evidence to meet this burden and, consequently, did not present sufficient evidence for a rational fact-finder to conclude beyond a reasonable doubt that he was guilty of aggravated assault, criminal discharge of a firearm at an occupied vehicle, and felony murder.

K.S.A. 2019 Supp. 21-5222 describes when a person is entitled to use self-defense:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

> "(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

This court has explained that a successful self-defense theory must pass a two-part test:

> "'The first is subjective and requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an objective standard and requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary.'" *State v. Haygood*, 308 Kan. 1387, 1405, 430 P.3d 11 (2018) (quoting *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 [2012]).

13

Buck-Schrag argues the evidence showed Larsen was the clear aggressor in this case and that he had a subjective and objectively reasonable belief that he needed to use deadly force to defend himself and Williams against Larsen. He points to the evidence that Larsen yelled at Buck-Schrag and drove erratically around the gas station, that he chased and slammed into the back of Williams' car, and that he was generally acting aggressively.

Although there was evidence that supported his self-defense theory, Buck-Schrag ignores the evidence that counters that theory.

Buck-Schrag never heard Larsen threaten him; he did offer evidence that he believed Larsen had yelled hostile remarks at him, and that he thought Larsen had flashed a clip at him, but Buck-Schrag was not sure what Larsen said or what object he had seen. Nonetheless, Buck-Schrag flashed his gun at Larsen and Reynolds. Notably, police never found a gun or a clip in Larsen's vehicle.

When Larsen started following Williams and Buck-Schrag, the two did not look or call for help; they continued driving. There was evidence that Larsen accidentally, rather than intentionally, collided with Williams' SUV: the impact was mild, it was snowing, the roads were icy, Williams herself had just lost control of her SUV and ran off the road, and Reynolds testified that Larsen's brakes had locked up and he had tried to swerve out of the way but accidentally struck Williams' SUV. After the collision, Buck-Schrag, who was not hurt, leaned out of his window and immediately began firing his weapon at Larsen's car. There is evidence that after Buck-Schrag finished shooting, Williams asked Buck-Schrag "why he did that." Her comments suggest there was no objective threat to her or Buck-Schrag's safety. There is evidence that Buck-Schrag responded, "[W]hat if

14

they had a gun and tried to shoot at us?" This suggests Buck-Schrag was not sure if there was an actual threat.

After the shooting, Buck-Schrag went to a friend's house to switch vehicles and then went to his mother's house to change his clothes and switch vehicles again. He did not tell his mother or his friend what had occurred. He then went home to his girlfriend and did not tell her what happened. The next morning, he threw away his gun. He left town when he heard the police were looking for him and asked Williams to lie about the events of the evening. The State argues these actions show that Buck-Schrag did not believe he was justified in shooting Larsen.

We find this was ample evidence for a rational fact-finder to conclude beyond a reasonable doubt that Buck-Schrag did not act in self-defense. Buck-Schrag's argument fails.

*Jury Instructions*

At trial, the district court provided the standard PIK instruction on affirmative defenses. Buck-Schrag alleges that the instruction, as given, amounted to clear error because it did not more specifically instruct the jury that the State was required to disprove beyond a reasonable doubt that self-defense and/or defense of another was warranted in this matter.

We review allegations of jury instruction error in multiple steps:

"We must first decide whether the issue has been preserved. Second, we analyze whether an error occurred. This requires a determination of whether the instruction was

15

legally and factually appropriate. We exercise unlimited review of those questions. Next, if we find error, we conduct a 'reversibility inquiry.'" *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018) (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 [2012]).

"'The standard for the reversibility inquiry depends on whether the instruction was properly requested in district court. . . . If the instruction was not requested, this court applies a clear error standard to the reversibility inquiry. "Under that standard, an appellate court assesses whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Williams*, 308 Kan. at 1451 (quoting *Williams*, 295 Kan. at 516). The burden to establish clear error is on the defendant. In examining whether a party has met its burden, we consider the entire record de novo. See *Williams*, 308 Kan. at 1451.' *State v. Gentry*, 310 Kan. 715, 720-21, 449 P.3d 429 (2019)." *State v. Gray*, 311 Kan. 164, 173, 459 P.3d 165 (2020).

Buck-Schrag did not request a different instruction in the district court, so we review for clear error.

Generally, when an appellant argues a trial court should have given an additional instruction, this court analyzes whether the additional instruction accurately reflects the law. If it did, then the instruction was legally appropriate. See, e.g., *Gray*, 311 Kan. at 173-74 (concluding instruction on second-degree murder would have been legally appropriate because it is lesser included offense of first-degree murder; moving on to whether instruction was factually appropriate).

The analysis here requires a different approach. Buck-Schrag argues that the affirmative defense instruction the trial court offered failed to accurately portray the law. Thus, we focus on that assertion:  did the standard PIK instruction appropriately inform

16

the jury of applicable legal requirements, or did the law require additional and more explicit language?

K.S.A. 2019 Supp. 21-5108(c) provides:

"A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. Once the defendant satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt."

Buck-Schrag insists the standard PIK instruction on affirmative defenses that the district court gave in this case did not fairly and accurately portray the law as provided in K.S.A. 2019 Supp. 21-5108(c). That instruction was:

"The defendant raises self-defense and/or defense of another person as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant." See PIK Crim. 4th 51.050.

This court considered an argument similar to Buck-Schrag's in *State v. Staten*, 304 Kan. 957, 963, 377 P.3d 427 (2016). There, the defendant was charged with aggravated battery but argued self-defense justified his actions. The district court instructed the jury that the defendant was permitted to use force against another individual if he had a subjective and objectively reasonable belief that such force was necessary. Regarding the State's burden of proof, it instructed the jury:

17

"'The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"'The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims required to be proved by the State, you should find the defendant guilty.'" *Staten*, 304 Kan. at 963.

Staten argued that the instructions were clear error because the court failed to instruct the jury that the State had a burden to prove beyond a reasonable doubt that his actions were not justified by self-defense—the same argument Buck-Schrag makes here.

This court observed that the trial court had not offered the standard "clarifying" PIK instruction on affirmative defenses. It then discussed a line of cases in which this court considered the same scenario and concluded there was no clear error because "everything necessary for the jury to consider the burden of proof was contained within the instructions." *Staten*, 304 Kan. at 966 (examining *State v. Osbey*, 238 Kan. 280, 285-86, 710 P.2d 676 [1985]; *State v. Crabtree*, 248 Kan. 33, 805 P.2d 1 [1991]; *State v. Sperry*, 267 Kan. 287, 978 P.2d 933 [1999]; *State v. Cooperwood*, 282 Kan. 572, 147 P.3d 125 [2006]).

The *Staten* court noted that the line of cases had all been decided before the enactment of K.S.A. 2019 Supp. 21-5108, when the statutory scheme "did not explicitly refer to the burden of proof when the defendant assert[ed] an affirmative defense." Rather, "it simply explained the presumption of innocence and the requirement of burden of proof beyond a reasonable doubt . . . ." *Staten*, 304 Kan. at 965. Since those cases had

18

been decided, the Legislature had, in K.S.A. 2019 Supp. 21-5108, "codified the caselaw requirement that, once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt." *Staten*, 304 Kan. at 965. But the *Staten* court held that the new legislation did not constitute a change in law that altered the State's burden of proof or the elements it was required to prove. Consequently, the cases decided under the previous statutory scheme were still authoritative. The *Staten* court ultimately held that the failure to give the affirmative defense PIK instruction amounted to error, but that it was not clear error based on "the instructions as a whole as well as the nature of the evidence supporting Staten's claim of self-defense." *Staten*, 304 Kan. at 967.

The trial court here offered the PIK instruction that was missing in *Staten*. This court has explained, while "[t]he use of PIK instructions is not mandatory," it is "strongly recommended" because they "have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Dunn*, 249 Kan. 488, 492, 820 P.2d 412 (1991).

Moreover, the court gave the jury additional instructions that helped ensure it accurately conveyed the law. As we have noted before, we do not consider an instruction in isolation, but "as a whole . . . to see whether it properly and fairly stated the law as applied to the facts of the case and could not have reasonably misled the jury." *State v. Horton*, 300 Kan. 477, 491, 331 P.3d 752 (2014). In these additional instructions, the trial court explicitly detailed the State's burden and told the jury that Buck-Schrag was permitted to act in defense of himself or another under certain circumstances:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are

19

convinced from the evidence that he is guilty. The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty.

. . . .

"The defendant claims his use of force was permitted as self-defense and/or the defense of another person. A defendant is permitted to use physical force against another person, including using a weapon, when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself or someone else against the person's imminent use of unlawful force. Reasonable belief requires both a belief by the defendant and the existence of facts that would persuade a reasonable person to that belief.

. . . .

"The defendant raises self-defense and/or defense of another person as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

The instructions in this case informed the jury the State had to prove the defendant guilty beyond a reasonable doubt, directed the jury to consider the asserted self-defense theory when deciding whether the State has met its burden of proof, and advised the jury that the burden of proof did not shift to the defendant based on this defense. Arguably, the instructions could have been clearer if they parroted the language of the statute by explicitly informing the jury that the State had to disprove the self-defense theory beyond

20

a reasonable doubt. But Buck-Schrag points to no authority suggesting that instructions must follow the exact language of the statute.

The instructions, as a whole, fairly and accurately stated the law. Consequently, they were not erroneous.

*Cumulative Error*

Buck-Schrag argues cumulative error warrants reversal. Because he has shown no error, this argument fails.

*Identical Offense Doctrine*

Buck-Schrag argues that the district court should have imposed a lower sentence based on the alternative conviction of reckless second-degree murder because, in his case, reckless second-degree murder is identical to felony murder.

Buck-Schrag did not raise this challenge below. He argues this court may review it for the first time under K.S.A. 2019 Supp. 21-6820(e)(3).

K.S.A. 2019 Supp. 21-6820(e)(3) provides that "in any appeal from a judgment of conviction, the appellate court may review a claim that: . . . (3) the sentencing court erred in ranking the crime severity level of the current crime or in determining the appropriate classification of a prior conviction or juvenile adjudication for criminal history purposes."

21

We recently rejected the argument that K.S.A. 2019 Supp. 21-6820(e)(3) requires an appellate court to review an identical offense argument for the first time on appeal. In *State v. Gray*, 311 Kan. 164, 459 P.3d 165 (2020), the defendant argued for the first time on appeal that the court should have sentenced him for intentional second-degree murder instead of his crime of conviction—premeditated first-degree murder—because those are identical offenses. Gray argued this court should review his unpreserved claim under K.S.A. 2019 Supp. 21-6820(e)(3). We disagreed, because Gray was "not challenging the classification of the crime of conviction." Rather, he was challenging "the district court's authority to sentence him based on the crime of conviction." 311 Kan. at 170.

Like the defendant in *Gray*, Buck-Schrag is not challenging the classification of his crime of conviction. He challenges the court's authority to impose the sentence it did based on that conviction. K.S.A. 2019 Supp. 21-6820(e)(3) does not require that we review his claim for the first time on appeal. We decline to do so.

*Attorney Fees*

Buck-Schrag argues the district court erred when it ordered him to pay $7,000 in attorney fees.

We perform an unlimited review of whether a district court comported with statutes governing the assessment of attorney fees. We review the amount of attorney fees imposed for an abuse of discretion. *State v. Hernandez*, 292 Kan. 598, 609, 257 P.3d 767 (2011).

22

K.S.A. 22-4513 provides:

"(a) If the defendant is convicted, all expenditures made by the State board of indigents' defense services to provide counsel and other defense services to such defendant or the amount allowed by the board of indigents' defense reimbursement tables as provided in K.S.A. 22-4522, and amendments thereto, whichever is less, shall be taxed against the defendant and shall be enforced as judgments for payment of money in civil cases.

"(b) In determining the amount and method of payment of such sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose."

Here, the State requested $9,500.00 in attorney fees. The court ordered Buck-Schrag to pay $7,000.00 after making the following comments:

"The Court is aware that Mr. Buck-Schrag is able-bodied. The Court believes that he will be employable and employed and given a job within the prison system. And the amount of $243 per year, that was described, that even the higher amount suggested by the State is an amount that is reasonable recognizing resources, recognizing burden."

Buck-Schrag argues that the court failed to fulfill the requirements of this statute because it did not consider his financial resources or the burden the fees would place on him. Buck-Schrag leans heavily on *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006). In *Robinson*, this court examined the requirements of K.S.A. 22-4513. It held that, under this statute,

"the sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose

23

*explicitly*, stating on the record how those factors have been weighed in the court's decision. Without an adequate record on these points, meaningful appellate review of whether the court abused its discretion in setting the amount and method of payment of the fees would be impossible." *Robinson*, 281 Kan. at 546.

In *State v. Johnson*, 286 Kan. 824, 852, 190 P.3d 207 (2008), this court vacated an order imposing attorney fees when the court failed to follow the directive in *Robinson*. In assessing fees, the sentencing court said only that costs would be assessed to the defendant. This court vacated the order and remanded the case with directions to consider the defendant's ability to pay and any financial burden the fees would impose. 286 Kan. at 852.

This court also vacated an order for attorney fees in *State v. Stevens*, 285 Kan. 307, 330-31, 172 P.3d 570 (2007). There, the sentencing court ordered the defendant to generally pay attorney fees and then inquired about his monthly income. After learning it was $800 per month, the court ordered the defendant to pay $50 monthly. The court never imposed a total amount of fees. This court remanded the case to the district court with directions to determine a total amount of attorney fees and to consider what amount the defendant could pay.

The sentencing court here did more than the courts in *Johnson* and *Stevens*. It noted it was ordering Buck-Schrag to pay $7,000 because even the higher amount would have been reasonable based on Buck-Schrag's resources and burden. This indicates that the court considered the financial burden attorney fees would place on Buck-Schrag. Consequently, the court adequately satisfied the requirements of K.S.A. 22-4513(b) and the directive in *Robinson*. We find no error.

24

The convictions and the order for attorney fees are affirmed.

WILSON, J., not participating.

MICHAEL A. RUSSELL, District Judge, assigned.[1]

FRANCIS E. MEISENHEIMER, District Judge, assigned.[2]

_____

[1]**REPORTER'S NOTE:** District Judge Russell was appointed to hear case No. 121,203 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.

[2]**REPORTER'S NOTE:** District Judge Meisenheimer was appointed to hear case No. 121,203 vice Justice Wilson under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.