NOT DESIGNATED FOR PUBLICATION

No. 127,063

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GERARDO AGUERO-HERNANDEZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE BROWN, judge. Submitted without oral argument. Opinion filed December 19, 2025. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HURST, P.J., GARDNER and BOLTON FLEMING, JJ.

PER CURIAM: J.K., a 12-year-old girl, was walking alone in Wichita in the early hours of May 22, 2020. The defendant, Gerardo Aguero-Hernandez, offered J.K. a ride. J.K. testified she accepted, but Aguero-Hernandez did not take her where she asked, and instead, assaulted her. At the conclusion of a five-day jury trial, Aguero-Hernandez was found guilty of rape, aggravated kidnapping, aggravated battery, and battery. He was found not guilty of attempted first-degree murder. Aguero-Hernandez appeals.

1

There are two issues on appeal:

- Did the district court commit reversible error by allowing the jury to hear the song "Dancing with the Devil" that Aguero-Hernandez discussed in recorded phone calls with his girlfriend?
- Did the prosecutor commit reversible error during closing argument?

As to the first issue, considering the significant evidence of guilt in this case, even if the district court erred in allowing the jury to hear the song "Dancing with the Devil," under a statutory harmless error analysis, such error was harmless. As to Aguero-Hernandez' second issue, considering the wide latitude given to prosecutors to draw inferences from the evidence, we do not find the comments made in closing argument to be in error. Nonetheless, applying a constitutional harmless error standard, any error was harmless. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The facts at trial in this case were that on May 21, 2020, J.K., a 12-year-old girl, and her foster sister decided to run away from their foster home. At some point that evening, J.K. departed from her foster sister and began walking toward Seneca Street where her grandfather lived. J.K. stopped at a QuikTrip around 10:24 p.m. and then stopped to get some peanut butter from a community food stand.

According to J.K., she continued walking until Aguero-Hernandez pulled into the driveway *in front* of her and blocked her path. Aguero-Hernandez asked J.K. if she needed a ride. J.K. thought the vehicle Aguero-Hernandez was driving "might have been maroon or red, and it had a stripe that was either black or gray, silver-type thing."

J.K. told Aguero-Hernandez she did not wish to ride with him a few times but eventually felt she needed to get in his vehicle. J.K. told Aguero-Hernandez that she

needed a ride to Seneca Street. Aguero-Hernandez told J.K. that his name was Jose and asked her if she wanted drugs. J.K. told him no.

After a short time, J.K. noticed they were going around the roundabouts in Riverside Park in Wichita. Instead of taking J.K. to Seneca Street, Aguero-Hernandez pulled off the road and tried to give J.K. a hug. J.K. told Aguero-Hernandez to stop, but Aguero-Hernandez pulled her into the back seat, causing J.K. to hit her back on the center console.

Aguero-Hernandez forced J.K. onto her stomach and pulled her pants and underwear down to her knees. J.K. grabbed at the rear driver's side door, trying to get out of the vehicle, but Aguero-Hernandez kept closing the door. J.K. continued to fight Aguero-Hernandez, but he penetrated her vagina with two of his fingers. Aguero-Hernandez told J.K. that "[i]f you just go with it, then I don't have to get violent." J.K. yelled for help and called out for her dad. Aguero-Hernandez told her he was "her dad."

J.K. continued to struggle against Aguero-Hernandez. Aguero-Hernandez then placed his hands around J.K.'s neck and choked her. J.K. could not breathe. In an attempt to escape, she kicked Aguero-Hernandez in the groin. J.K. testified that Aguero-Hernandez told her if she was going to be that way to just go. J.K. jumped into the front seat and fled the vehicle.

J.K. testified that she ran to a nearby water treatment plant and rang the bell. Damion Low, an employee of the plant, answered the door and J.K. asked him for help. Low testified J.K. was a "little hysterical" and told him she had been picked up by a man and taken to the park. J.K. said the man grabbed her and hit her, but she got away and came to the water treatment plant. Low testified he did not ask a lot of questions but tried to make J.K. feel safe and called 911. Linda Ester, an employee of Sedgwick County 911, testified she received a call about J.K. at 12:38 a.m. on May 22, 2020.

3

Officer Leonardo Vargas responded to the 911 call around 1:00 a.m. and met J.K. at the water treatment plant. J.K. provided Officer Vargas with a description of the man that had assaulted her, stating he was Hispanic, with black hair, black ponytail, and some facial hair on his chin. J.K. thought the man was 5'7" to 5'8" with a heavy build and was wearing an orange shirt and gray sweatpants. Officer Vargas and J.K. drove around to allow J.K. to point out places that were familiar from the night. Officer Vargas then took J.K. to Wesley Medical Center for a SANE/SART exam with a forensic nurse.

A sexual assault interview and evaluation was performed, and J.K.'s clothing was taken for testing. The forensic nurse, Amy Mitchell, testified that she met J.K. around 4:15 a.m. She catalogued injuries to J.K.'s lips, eyes, nose, ear, neck, chest, and head, in the form of petechiae (redness from broken blood vessels), swelling, and bruising. Mitchell testified J.K.'s knees were also skinned and bruised and that J.K. had abrasions on her hands. Mitchell stated J.K.'s vaginal examination also indicated injury, including bruising, petechiae and abrasions. Mitchell testified the injuries were consistent with penetration. J.K. also consented to a DNA swab of her cheek, as well as her inner and exterior genital areas and anus. DNA analysis was also performed on J.K.'s clothing.

Using the information J.K. provided, law enforcement reviewed security footage from several businesses along the route. Detective Latavia Allen sent pictures of a two-tone vehicle from the videos to all law enforcement in the Wichita area. Law enforcement officers were able to identify the vehicle, a Buick Rendezvous, and ultimately a suspect, Aguero-Hernandez, based on the description given by J.K. and the footage. A photo array was compiled, and J.K. identified Aguero-Hernandez as the man who attacked her.

Law enforcement executed a search warrant early on May 28, 2020, and Aguero-Hernandez was taken into custody. A black scale with white powder residue was found in the search of his residence. Testing confirmed the white powder was cocaine. Aguero-Hernandez' vehicle was also searched, and several substances were sent for testing, later

4

confirmed to be marijuana, cocaine, and mushrooms. The vehicle was also swabbed for DNA evidence. The test results pertaining to swabs from the rear, interior door handle on the driver's side indicated J.K. could not be excluded as a major contributor of DNA.

Aguero-Hernandez was interviewed by Detective Allen. He told Detective Allen he did not remember anything occurring on the date in question. He stated that he drank a lot most nights that week and would sometimes blackout. He did not remember driving his vehicle that night and denied interacting with any girl. Aguero-Hernandez consented to DNA testing during questioning. Some items of J.K.'s clothing did not have enough DNA to compare, but the swab taken from the front of her pants indicated the presence of a mixture of DNA from two people, one of which was male. J.K. was a major contributor to the DNA located on the front of her pants, and Aguero-Hernandez could not be excluded as a minor contributor.

Officer Allen also testified about the content of recorded phone calls between Aguero-Hernandez and his girlfriend in June 2020—around one month after the incident in question. In one call, Aguero-Hernandez told his girlfriend, Miriam Perez-Martinez, that the girl was a drug addict and wanted coke, but that he did not give it to her. On another call the same day, Aguero-Hernandez told Perez-Martinez that he did not blame her, but Perez-Martinez was supposed to be watching him. In that same call, he made a comment about trying not to think "violent" and talked about how he should not have been listening to "Dancing with the Devil" and how the devil follows you. On another call with Perez-Martinez the next day, Aguero-Hernandez stated "it wasn't him and it's fucked up if he has to suffer from somethin' that Satan made him do" or "not do." Perez-Martinez then added a comment about drinking making him do things. The two talked again about being influenced by bad music and the fact "maybe this was supposed to happen." The couple talked again on June 4. Perez-Martinez confronted Aguero-Hernandez about what his intentions were when he picked up the girl. Aguero-Hernandez commented about "letting his evil thoughts take over" and that "she looked like she

5

needed help." Three days later, in another call with his girlfriend, Aguero-Hernandez talked about drinking too much and mentioned music again, saying he was "gonna try not to listen to the same music that he used to."

Gerardo Aguero-Hernandez was charged with rape, aggravated kidnapping, and two counts of aggravated battery. An additional charge of attempted murder in the first degree was added at the preliminary hearing on October 23, 2020. Following a five-day jury trial, Aguero-Hernandez was found guilty of rape, aggravated kidnapping, aggravated battery, and a lesser-included crime of battery. He was found not guilty of attempted first-degree murder. Aguero-Hernandez timely appeals.

ANALYSIS

DID THE DISTRICT COURT COMMIT REVERSIBLE ERROR BY ALLOWING THE JURY TO HEAR THE SONG "DANCE WITH THE DEVIL"?

*Standard of Review*

In general, all relevant evidence is admissible. *State v. Baker*, 287 Kan. 345, 363, 197 P.3d 421 (2008). K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." Evidence is relevant if both material and probative. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). "A material fact is one that has some real bearing on the decision in the case. Materiality presents a question of law that appellate courts consider de novo. [Citations omitted.]" *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022).

Evidence is probative if it tends to prove a material fact. Appellate courts review the question of whether evidence is probative under an abuse of discretion standard. *Alfaro-Valleda*, 314 Kan. at 533. A trial court abuses its discretion if its action (1) is arbitrary, fanciful, or unreasonable; in other words, if no reasonable person would have

taken the view adopted by the trial court; (2) is based on an error of law; in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact; in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Brown*, 295 Kan. 181, 206, 284 P.3d 977 (2012).

*Discussion*

The State initially charged Aguero-Hernandez with aggravated kidnapping, two counts of aggravated battery, and rape.

The song, "Dance with the Devil," was first introduced at Aguero-Hernandez' preliminary hearing. The State relied upon jailhouse calls between Aguero-Hernandez and his girlfriend, Miriam Perez-Martinez, for evidence. These calls included comments about the song, "Dance with the Devil."

At the conclusion of the preliminary hearing, the State sought leave to amend the complaint to add an additional charge of attempted first-degree murder. Part of the State's argument was that the charge was appropriate based upon similarity of the lyrics of the song "Dance with the Devil" and Aguero-Hernandez' alleged actions. The State argued the Aguero-Hernandez' reference to the song was evidence of intent. Aguero-Hernandez' attorney argued against the attempted murder charge because J.K. testified her attacker let her go, which was inconsistent with the song. The district court found that the State had met its burden in proving probable cause and granted the State leave to amend the complaint to add a charge of attempted murder in the first degree.

Prior to opening statements at the jury trial, Aguero-Hernandez' attorney again objected to the use of the song "Dance with the Devil," arguing it was improper for the State to present this song as evidence of Aguero-Hernandez' intent simply because some

7

of his alleged actions were like the song. Aguero-Hernandez also contended the song was not relevant because the choking did not render J.K. unconscious. Further, in the song, the victim was murdered, whereas here, J.K. was let go.

The State sought to use "Dance with the Devil" to provide evidence of intent. The song references drugs, picking someone up, attacking them, and murdering them. In his interview with Officer Allen after being taken into custody, Aguero-Hernandez said, "I feel like spirits talk to me. . . . Like demons." He continued that "they really want no good for me. They want to harm me and others around me." Aguero-Hernandez told his girlfriend that he listened to "Dance with the Devil" that night and said the devil follows you. Aguero-Hernandez stated he probably should not have been listening to that song that night. Aguero-Hernandez and his girlfriend talked on more than one occasion about being influenced by the bad music.

The district court stated that a song or genre of music is generally not admissible to show a defendant's state of mind. But the district court distinguished this case in its ruling, finding:

> "The thing that makes this so unusual and different is the fact that it's the defendant who, in this phone call, says this is the song I'm listening to, I shouldn't have, or words to that effect, and it's done in the context of this phone call that I think makes it probative, and more probative than it is prejudicial."

Aguero-Hernandez again objected when the song was referenced and played for the jury. The jury was allowed to hear the full song in open court. Aguero-Hernandez argues on appeal that the district court erred in playing the song for the jury.

Here, even if we assume the district court abused its discretion in allowing the song to be played for the jury, under the specific facts of this case, the error was clearly harmless. Because this case involves an alleged violation of evidentiary limitations, and

8

not a constitutional right, we apply the statutory harmless error test. *State v. McCullough*, 293 Kan. 970, 981, 270 P.3d 1142 (2012). When applying the harmless error test to an error that implicates a statutory right, and not a federal constitutional right, the court must determine if there is a reasonable probability that the error will or did affect the trial's outcome considering the entire record. *State v. Campbell*, 317 Kan. 511, 518, 532 P.3d 425 (2023). "As the party who benefits from the improper admission of evidence under the statute, the State bears the burden of proof." 317 Kan. at 518.

To apply the statutory harmless error analysis, we consider what evidence supports Aguero-Hernandez's conviction. *State v. Claerhout*, 54 Kan. App. 2d 742, 757-59, 406 P.3d 380 (2017) (finding harmless error based on overwhelming evidence of guilt), aff'd 310 Kan. 924, 453 P.3d 855 (2019). Here, upon review of the entire record, there was not a reasonable probability that any error would have affected the outcome of the trial. *Campbell*, 317 Kan. at 518.

The evidence against Aguero-Hernandez was significant. The victim, J.K. described her assailant in detail and gave a detailed description of the events that occurred that night. She assisted officers in recreating her route including finding the jar of peanut butter she had discarded. Surveillance video showed Aguero-Hernandez' vehicle travelling along the route J.K. described, near the water treatment plant. Low testified about J.K.'s appearance and demeanor when she came to the water treatment plant.

J.K. picked Aguero-Hernandez out of a photo lineup and identified him again at trial. Swabs from interior of the vehicle Aguero-Hernandez was driving led to a test result that J.K. could not be excluded as a contributor to DNA found on the rear passenger door handle. DNA testing of the clothing J.K. wore that night revealed that Aguero-Hernandez could not be excluded as a minor contributor to DNA found on the front thigh area of J.K.'s pants.

There was also testimony from the SANE/SART nurse at trial that described injuries to J.K.'s lips, eyes, nose, ear, neck, chest, and head. The nurse also testified J.K.'s knees were skinned and bruised and that she had abrasions on her hands. The nurse testified that J.K.'s vaginal examination also indicated injury consistent with penetration.

Finally, recorded calls between Aguero-Hernandez and his girlfriend contain various admissions that Aguero-Hernandez did in fact have contact with a girl that evening, and felt remorse.

The jury also appears to have analyzed each charge carefully, finding Aguero-Hernandez guilty of aggravated battery on one count while finding him guilty of the lesser charge of battery on the other count of aggravated battery. The jury also found Aguero-Hernandez not guilty of attempted murder in the first degree. There is overwhelming evidence of guilt in this case, and there was not a reasonable probability that any error would have affected the outcome of the trial. Even assuming the district court erred in playing the song to the jury, that error was harmless because it did not affect the outcome.

DID THE PROSECUTOR COMMIT REVERSIBLE ERROR DURING CLOSING ARGUMENT?

*Standard of Review*

In *State v. Coleman*, 318 Kan. 296, 543 P.3d 61 (2024), the Kansas Supreme Court considered claims of prosecutorial error and applied a two-step standard of review:

> "First, considering a prosecutor's statements in context, appellate courts ask whether the prosecutor stepped outside the wide latitude afforded prosecutors 'to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial.' *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022); *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021). This wide latitude extends to allow prosecutors to

10

highlight evidence and discuss inferences reasonably drawn from that evidence. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020). But a prosecutor may not misstate the law applicable to the evidence, comment on witness credibility, or shift the burden of proof to the defendant. *State v. Hilt*, 307 Kan. 112, 124, 406 P.3d 905 (2017); see *State v. Sherman*, 305 Kan. 88, Syl. ¶ 5, 108-09, 38 P.3d 1060 (2016).

"If an error is found, appellate courts move to the second step of review to determine whether to reverse the defendant's convictions because of the prosecutor's error. In that review, appellate courts apply the traditional constitutional harmlessness test stated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See *Sherman*, 305 Kan. at 109. Under that test, 'prosecutorial error is harmless if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict."' 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011])." *Coleman*, 318 Kan. at 302-03.

*Discussion*

Aguero-Hernandez alleges prosecutorial error occurred during the State's closing argument because the prosecutor appealed to "community interests" and misstated facts in evidence. Aguero-Hernandez identifies the following statements in the prosecutor's closing argument as being made in error:

"So he picks the song, that song, with the lyrics about selling coke, rape, murder, a girl off the street. He gets in his car, he makes that decision to drive alone. He finds a girl walking on the street. *He takes advantage of the very vulnerable 12 year old, after midnight, on North Broadway*." (Emphasis added.)

The prosecutor continued, arguing that:

"[T]his is a 12-year-old girl, *but this is a 12-year-old girl since the age of eight has had to trust strangers to take care of her* . . . . He tries to sell her cocaine. You know that there's

11

a scale, it has residue at the house, it has cocaine. *It's part of that song, he offered it to this child, he offered to sell her drugs, just like the song*. He then makes decisions of where to drive her. He makes decisions to go down Broadway, he makes a decision to turn to the park where he goes with his family, that he's familiar with, he makes the decision to pull over right there, *isolated part, after midnight, in our community*." (Emphases added.)

"She's grabbing that handle to try to get out, he keeps pulling it shut. Remember the song, she's screaming, help me, help me. That's exactly what [J.K.] was doing, trying to get out and he's pulling it shut."

*Community Interests*

Aguero-Hernandez asserts the State implored the jury to convict to prohibit such conduct in its community. Appellate courts have found error when the prosecution appeals to the jury's sense of community or makes the jury feel like it is responsible for protecting its community. Claims of prosecutorial error are fact specific, and outcomes depend on the facts of each case. *State v. Buck-Schrag*, 312 Kan. 540, 544, 477 P.3d 1013 (2020).

Aguero-Hernandez does not specifically identify the language he believes was in error because it appealed to the jury's sense of community. Of the language Aguero-Hernandez included in his brief from the closing argument, "community" is mentioned only one time: Aguero-Hernandez takes J.K. down Broadway, takes her into the park where he goes with his family, and pulls over in an "isolated part, after midnight, in our community." The State does mention the word "community" in its closing argument but not in the same context as cases where appellate courts have found prosecutorial error.

For example, in *State v Finley*, 268 Kan. 557, 998 P.2d 95 (2000), which Aguero-Hernandez cites in his brief, "the prosecutor informed the jurors that they were the ones who enforced the laws in the country and that 'this kind of drug use in our community'

12

could not be tolerated, especially when a person dies, and therefore the jury had to find the defendant guilty." 268 Kan. at 572. This is strong language, imploring the jurors to act to protect where they live. The Kansas Supreme Court stated that "the remarks of the State were clearly improper" and were "unrelated to the question the jury should have considered." *Finley*, 268 Kan. at 572. The court found that based on the record as a whole, it was "not at all clear beyond a reasonable doubt that the error had little, if any, likelihood of changing the result." *Finley*, 268 Kan. at 572.

*Finley* is easily distinguished from the present case. In *Finley*, the State was prosecuting Finley for felony murder and the manufacture of methamphetamine. A woman died in a fire at Finley's residence and evidence suggested methamphetamine production was the cause of the fire. *Finley*, 268 Kan. at 558. The question before the jury was whether Finley was at his residence when the fire occurred. Referring to tolerating drug use in the community is clearly not related to answering whether the defendant was at home.

In the present case, the prosecution's only reference to "community" was when the State mentioned pulling over in an isolated area near where Aguero-Hernandez came with his family. This use of the term "community" does not share the same connotation as the prosecution's statement in *Finley*. It does not appeal to the jury to assume the role of protector.

Aguero-Hernandez also cites *State v. Witten*, 45 Kan. App. 2d 544, 251 P.3d 74 (2011). In *Witten*, the defendant complained of the prosecutor's comments during closing argument. The prosecution said:

> "'We know about the drug activities. We know things are going on. We hear about methamphetamines and now we're addressing a real problem. We're addressing a

real situation. Somebody in our community is selling methamphetamines. Now it's up to you and I ask you to find [defendant] guilty on both counts.'" 45 Kan. App. 2d at 553.

The *Witten* panel stated, "A prosecutor should not make statements intended to inflame the prejudices of the jury or to divert the jury's attention from its duty to decide the case based on the evidence and the controlling law." 45 Kan. App. 2d at 553 (citing *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 [2004]). The court found that "the prosecutor's statements were improper and intended to appeal to the passions of the jurors." *Witten*, 45 Kan. App. 2d at 553. Even though the statements were inappropriate, the court concluded, "under the facts of this case . . . the prosecutorial misconduct constitutes harmless error." *Witten*, 45 Kan. App. 2d at 554-55.

*Witten* is also easily distinguished. The language in *Witten* directly implored the jury to take action to protect the community. 45 Kan. App. 2d at 553. The isolated use of the word "community" in the present case simply does not rise to the level of prosecutorial error.

*Facts Not in Evidence*

Prosecutors are given great latitude to draw inferences from the evidence, but "it is clearly improper for a prosecutor to state facts that are not in evidence." *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017). See *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200 (2004). "[O]n the other hand, prosecutors are allowed 'to craft arguments that include reasonable inferences to be drawn from the evidence.'" *Banks*, 306 Kan. at 862 (quoting *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 [2010]).

Aguero-Hernandez argues the prosecutor included facts not in evidence or misstated the evidence in the following ways:

14

(1)     The prosecution wanted the jury to believe "Aguero-Hernandez was driving around listening to that song contemporaneously to picking up JK";

(2)     The prosecutor stated, "just like the song," Aguero-Hernandez offered to sell J.K. cocaine;

(3)     The prosecutor stated "remember the song, she's screaming, help me, help me"; and

(4)     References to J.K. as "a very vulnerable 12-year-old" and "a 12-year-old girl since the age of eight has had to trust strangers to take care of her" make J.K. a sympathetic victim.

It is important to consider each of these arguments within the context of the State's closing argument:

"Thought the matter over beforehand. That was part of the definition you just heard about premeditation. And the evidence shows you that this defendant thought everything over beforehand. It also goes to what his intent is and that he was intentional and did everything knowingly.

"So I want to talk about every decision he made and what the evidence showed you about the decisions he made on that night, early morning hours of the 22nd of May. He chose the song to listen to. He knew the lyrics, he knew what it was about and he put that song in his head. Now, the State's not saying rap's bad and it's gonna make everybody go out and do these, but the defendant tells you this is why—a reason, he blames the song, that it's an explanation of what went down on that day.

"So he picks the song, that song, with the lyrics about selling coke, rape, murder, a girl off the street. He gets in his car, he makes that decision to drive alone. He finds a girl walking on the street. He takes advantage of the very vulnerable 12 year old, after midnight, on North Broadway.

"He pulls in the driveway, he doesn't pull up on Broadway, what does he do? How does she describe? He blocks her path. So she had to make a decision I'm either

15

gonna go in front of him and he may run me over, I gotta go behind him, he may back up. He's there, he's asking, do you need a ride. No, no, no, and finally I said okay. He was bugging me, I didn't wanna say no. And remember, this is a 12-year-old girl, but this is a 12-year-old girl since the age of eight has had to trust strangers to take care of her. He made that decision. He made the decision to pick her up. And there's no way he confused her for an 18-year-old woman. You saw how tiny she was.

"He tries to sell her cocaine. You know that there's a scale, it has residue at the house, it has cocaine. It's part of that song, he offered it to this child, he offered to sell her drugs, just like the song. He then makes decisions of where to drive her. He makes decisions to go down Broadway, he makes a decision to turn to the park where he goes with his family, that he's familiar with, he makes the decision to pull over right there, isolated part, after midnight, in our community. You saw the lack of cars going down there. He makes that decision.

"He makes the decision that he has to pull her into the back seat because that's the way he can rape her. Doesn't happen in the front seat, he makes that decision— remember, she says he puts his hands, takes that deep breath, he knows here it goes, I'm gonna do what I planned. Grabs a hold of her, hugs her, puts her in that back seat, because that's where he needs to have her laid out on her belly, grabs her pants, pulls them down, conscious decisions by this defendant to rape her. Pulls her panties down, pulls her black pants down and then he inserts his fingers into her, penetration of her, hard enough that she's bruised, petechiae, injuries.

"She's grabbing that handle to try to get out, he keeps pulling it shut. Remember the song, she's screaming, help me, help me. That's exactly what [J.K.] was doing, trying to get out and he's pulling it shut. That handle, that handle is what she's trying to do.

"Then what does he decide to do? Strangle her. Here comes the intent to kill. What happens when you put your hands around someone's neck, apply pressure? You kill 'em."

In his first point of error, Aguero-Hernandez identifies this specific portion of the State's closing:

16

"So he picks the song, that song, with the lyrics about selling coke, rape, murder, a girl off the street. He gets in his car, he makes that decision to drive alone. He finds a girl walking on the street. He takes advantage of the very vulnerable 12 year old, after midnight, on North Broadway."

Aguero-Hernandez argues there was no evidence that he listened to the song contemporaneously with luring J.K. into his vehicle. But the prosecution does not outright state Aguero-Hernandez was listening to the song at the time of the commission of the crime. Aguero-Hernandez did admit to listening to the song the same day and that it was not a good idea to do so. The difference between listening to violent lyrics *within the same day* a crime was committed and listening to that same music *at the actual time* a crime is being committed is minimal. Considering the great latitude afforded to prosecutors to draw inferences from the evidence, we cannot say that this comment was made in error. *Banks*, 306 Kan. at 862.

Next, Aguero-Hernandez contends the song does not include lyrics of selling cocaine to 12-year-old girls and alleges the prosecutor misstated evidence by stating his actions were "just like the song." The song does include lyrics about selling rock, and J.K. testified that Aguero-Hernandez offered her drugs. There were also drugs found in the vehicle and in his home. While not verbatim, the prosecutor is allowed to let the jury make inferences from the evidence. Evidence that Aguero-Hernandez possessed drugs was part of the evidence before the jury. This reference by the prosecutor does not constitute error.

Aguero-Hernandez also argues the prosecution misstated the evidence "when it urged the jury to 'remember the song, she's screaming, help me, help me,'" because these exact lyrics were not in the song. The song states that she "struggled hard," but they "held her down . . . Screamin' '. . . and stop movin' around.'" J.K. testified that she screamed for help and fought to get away. The statement by the prosecution is a reasonable inference and does not constitute error.

17

Finally, during closing argument, the prosecutor described J.K. as "a very vulnerable 12-year-old" and "a 12-year-old girl since the age of eight has had to trust strangers to take care of her." The evidence in the case was that J.K. was in foster care. It is a reasonable inference that J.K. relied on others and was vulnerable. J.K.'s age and her placement in foster care are also relevant facts the jury could use to consider J.K.'s credibility.

Though we find no error in the prosecutor's statements, we note that any error would be harmless under the facts of this case. In cases where error has been established, the appellate court proceeds to the second step of review to determine whether the error was harmless. We apply the constitutional harmless error analysis for claims based on prosecutorial error. *State v. Cherry*, 320 Kan. 784, 791, 571 P.3d 976 (2025).

Prosecutorial error is "harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

In conducting a constitutional harmless error analysis, we again consider the evidence contained in the record as a whole. "Harmlessness in each case is decided individually, in the context of the entire record." 320 Kan. at 793. Overwhelming evidence against the defendant may justify a finding that any prosecutorial error, including cumulative error, is harmless. 320 Kan. at 793.

In *Cherry,* the Kansas Supreme Court conducted a constitutional harmlessness analysis. In holding that the prosecutorial error in that case constituted harmless error, the court found that "[e]xpert testimony, law enforcement testimony, first responder testimony, video evidence, and physical evidence" supported the testimony of the

18

victims. The court also noted eyewitness testimony. Considering the significant evidence against the defendant in that case, the court found harmless error. 320 Kan. at 791-92.

As previously described, overwhelming evidence of guilt exists in this case against Aguero-Hernandez. J.K. was able to describe Aguero-Hernandez in detail and later identified him from a lineup. J.K. also identified Aguero-Hernandez at trial. J.K. gave very specific information to law enforcement as to the location where the incident occurred that was corroborated by finding the jar of peanut butter she had been eating as well as video of Aguero-Hernandez' vehicle along the route. Low also corroborated J.K.'s testimony by recounting her appearance and comments when she arrived at the water treatment plant. DNA evidence also confirmed J.K.'s testimony. A SANE/SART nurse described J.K.'s multiple physical injuries as well as her vaginal injury that was consistent with penetration. The jury also considered phone calls between Aguero-Hernandez and his girlfriend related to a graphic song he had listened to. The phone calls also contained admissions from Aguero-Hernandez related to his actions. Considering the overwhelming evidence against Aguero-Hernandez and the nature of the prosecution's statements, any potential errors alleged by Aguero-Hernandez, even if cumulative, would be constitutionally harmless.

Affirmed.